

# NUMBER 13-11-00254-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**MARY ALICE PALACIOS,**                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                        **Appellee.**

## On appeal from the 398th District Court
## of Hidalgo County, Texas.

# O P I N I O N

## Before Chief Justice Valdez and Justices Rodriguez and Garza
## Opinion by Chief Justice Valdez

Appellant, Mary Alice Palacios, was convicted of official oppression by intentionally or knowingly subjecting Leroy Trevino and Francisco De Luna III to an arrest that she knew was unlawful. *See* TEX. PENAL CODE ANN. § 39.03(a)(1) (West, Westlaw through 2013 3d C.S.). She was sentenced to thirty days' confinement in the county jail and

assessed a fine of $4,000 for each count.[1]  However, the sentences were suspended, and appellant was placed on community supervision for six months.  By several issues, appellant challenges the convictions.[2]  We reverse and render an acquittal.

## I.  UNLAWFUL ACT

This case arises from appellant's acts and decisions she made while exercising her judicial duties as Justice of the Peace for Precinct 4, Place 2 in Hidalgo County, Texas.  At issue are appellant's interpretation of applicable law in the area of truancy and her authority to act in issuing arrest warrants for Trevino and De Luna.  Specifically, the State claimed that appellant's court lacked jurisdiction to issue arrest warrants for De Luna, that she violated double jeopardy principles, and that she caused Trevino to be arrested for failure to appear in her court when he did in fact appear.  In connection with the foregoing, the State indicted appellant for three counts of official oppression, accusing her of subjecting Trevino, De Luna, and Elizabeth Diaz to arrests that she knew were unlawful.[3]  Appellant contends that the State's premise is incorrect under the penal code's definition of unlawful.  Specifically appellant argues that under the penal code, her court's lack of jurisdiction and her alleged violation of De Luna's right against double jeopardy do

---

[1] The jury acquitted appellant of a third charge of official oppression of Elizabeth Diaz.

[2] Specifically, appellant contends:  (1) the State failed to prove beyond a reasonable doubt that she knew that the arrests were "unlawful," that she was not justified or privileged, and that the arrests were actually unlawful as defined by the penal code (issues one, two, and three); (2) the jury charge failed to include the statutory definition of unlawful and appellant suffered egregious harm (issue four); and (3) appellant's trial counsel rendered ineffective assistance (issue five).

[3] Because the jury acquitted appellant of the charge related to Diaz, we will not provide a summary of that charge in this opinion.  *See* TEX. R. APP. P. 47.1.

2

not make her act of signing the arrest warrants in this case unlawful as defined by the penal code.[4]  In other words, there was nothing criminal or tortious about her acts.

Under a hypothetically correct jury charge, to convict appellant of official oppression as alleged in this case, the State had to prove that appellant, a public servant, while acting under color of her office or employment, intentionally subjected Trevino and De Luna to an arrest that she knew was "unlawful."  *See* TEX. PENAL CODE ANN. § 39.03(a)(1); *see also State v. Edmond*, 933 S.W.2d 120, 127 (Tex. Crim. App. 1996) (explaining that when charged with official oppression by mistreatment, the defendant must have known that the mistreatment alleged in the indictment was in fact unlawful in that it was either criminal or tortious).  The penal code defines "'[u]nlawful' as criminal, tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege."  TEX. PENAL CODE ANN. § 1.07(a)(48) (West, Westlaw through 2013 3d C.S.).  Thus, the State had to prove that appellant, while acting under color of her office, intentionally subjected Trevino and De Luna to an arrest that she knew was criminal, tortious, or both.  *See id.*, § 39.03(a)(1); *Edmond*, 933 S.W.2d at 127 ("In order for a defendant to [know that his conduct] is unlawful [under the official oppression statute, the conduct] must be in fact, unlawful.  Otherwise a defendant's 'mistake of law' as to the illegality of his own act would create liability where none before existed.").

The preliminary issue before us is whether appellant's acts of signing the arrest warrants were criminal or tortious.[5]  Although at trial, the State did not allege that any of

---

[4] The State has not explained how appellant's acts were criminal or tortious.

[5] It is undisputed that the jury was not provided the penal code definition of unlawful.  Thus, it was not informed that appellant's act had to be criminal and/or tortious.

3

appellants acts were criminal or tortious, we understand the State's theory as being that appellant's acts were criminal because her court lacked jurisdiction, she violated double jeopardy principles, and she had Trevino arrested for an offense he did not commit.[6] *See id.* A crime is "an act or the commission of an act that is forbidden or the omission of a duty that is commanded by a public law and that makes the offender liable to punishment by that law." Webster's http://www.merriam-webster.com/dictionary/crime. Here, the State does not cite to any law, and we find no law or authority, that makes a judge criminally liable to punishment if that judge performs an act, such as signing an arrest warrant, though her court lacks jurisdiction. Regarding the violation of double jeopardy principles, again the State cites no law, and we find none, that makes a judge criminally liable to punishment if that judge signs a warrant for a person's arrest in violation of the defendant's right against double jeopardy.

Our interpretation of what constitutes an "unlawful" act under the penal code is bolstered by our review of cases determining whether a police officer's discharge of his official duties is unlawful. For example, in *Hall v. State*, the issue before the court of criminal appeals was whether a police officer had acted "unlawfully" or within the "lawful discharge" of his official duties when he pushed an inmate. 158 S.W.3d 470, 474 (Tex. Crim. App. 2005). The court explained that a police officer is acting within the lawful discharge of his official duties if he "is not criminally or tortiously abusing his office as a

---

[6] The State argues that appellant had no right to violate De Luna's constitutional rights by subjecting him to double jeopardy, and issuing invalid warrants. The State further argues that the evidence "supports a conclusion that an ordinary prudent man in Appellant's circumstances would realize that it was unlawful to arrest someone for not appearing in court who actually did appear and to arrest another person after having transferred jurisdiction over their cases to the juvenile court." However, the State has not explained at trial or on appeal, how appellant's act of signing the warrants when the court lacked jurisdiction, is criminal, especially if that judge merely misinterpreted the law. We have been unable to find any authority to support such a conclusion.

public servant." *Id.* at 475. The court of criminal appeals explained that when determining the "lawfulness" or "unlawfulness" of the officer's acts, the appellate court does not concern itself with whether the officer has crossed every "t" and dotted every "i." *Id.* In other words, whether the officer's acts were unlawful does not depend on whether the officer lawfully arrested the defendant or on whether the officer read the *Miranda* warnings to the defendant. *Id.* (citing *Guerra v. State*, 771 S.W.2d 453, 461 (Tex. Crim. App. 1988); *Montoya v. State*, 744 S.W.2d 15, 29 (Tex. Crim. App. 1987), *overruled on other grounds by Cockrell v. State*, 933 S.W.2d 3, 89 (Tex. Crim. App. 1996)).[7] Instead, what matters is whether the officer's acts were criminal, tortious, or both. *See Id.*

Although the case before us does not involve the issue of lawful discharge of official duties, we find *Hall* instructive and analogous to the situation here. This same reasoning applies to judges, whether a judge's acts are unlawful as defined by the penal code does not depend on whether the judge lawfully issues a warrant, indeed, there are multiple cases wherein a judge's warrant is found to be invalid or a police officer's initial

---

[7] Under the State's theory, it appears to us, that an officer could be guilty of official oppression depending on the facts of the case if that officer lacked legal authority to make the arrest because under the State's theory in this case, the arrest would be "unlawful." However, as the court of criminal appeals has clearly stated, such a lack of legal authority is not criminal, tortious, or both. *See Hall v. State*, 158 S.W.3d 470, 474–75 (Tex. Crim. App. 2005); *Montoya v. State*, 744 S.W.2d 15, 29 (Tex. Crim. App. 1987), *overruled on other grounds by Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).

In such cases, the State would also have to prove that the officer knew that the arrest was unlawful. In this case, the State argued that appellant knew that her actions were "unlawful" because the law is so obvious and clear. However, in our above example, what if an officer subjectively believed that he had probable cause to arrest a defendant. But, the State believes that the law is so obvious and clear that there was no probable cause to arrest. The State could bring official oppression charges against the arresting officer and then argue to the jury, as it has in this case, that this officer knew the law and by implication, he knew that there was no probable cause to arrest the defendant. Allowing such an outcome could lead to inconsistent results because if the law is so obvious and clear that there is no probable cause, then the officer will be convicted; however, if the law is more complex, and the State does not believe that there was a lack of probable cause, even if no probable cause existed to arrest the defendant, the officer would not be guilty of official oppression. We cannot agree with the State that merely knowing the law amounts to knowing that the arrest is "unlawful," unless the acts are criminal, tortious, or both.

5

warrantless arrest is without probable cause. *See Stiggers v. State*, 506 S.W.2d 609 (Tex. Crim. App. 1974) (concluding that the arrest of appellant was "unlawful" but stating that "[a]n unreasonable seizure of the person that does not produce evidence of culpability does not per se vitiate a conviction. This is particularly true where, as here, there is no claim that any circumstance of the alleged illegal arrest led to appellant's conviction, the evidence supporting which is unchallenged."); *Hamm v. State*, 709 S.W.2d 14, 15 (Tex. App.—Corpus Christi 1986, no pet.) ("If a conviction is not based upon the fruits of an illegal detention, the mere fact that the illegal detention occurred will not invalidate the subsequent conviction.").[8] However, as set out in *Hall*, what matters is whether the judge is criminally or tortiously abusing his office as a public servant. *See Hall*, 158 S.W.3d at 475.

We understand that the court in *Hall* analyzed whether a defendant had the right to defend himself with physical force from a public servant. However, pertinent to our

___

[8] In the above-cited cases, the courts found that the arrest may have been "illegal" or "unlawful" using the general definition of unlawful. *See* http://www.merriam-webster.com/dictionary/unlawful (establishing that unlawful means that something is "not allowed by the law"); http://www.merriam-webster.com/dictionary/illegal?show=0&t=1405349622 (defining illegal as "not according to or authorized by law"). In those cases where a trial court has no jurisdiction or a double jeopardy violation has occurred, the appellate court in reversing the trial court's acts is concluding that the trial court's acts are not allowed by the law, which includes among other things, the United States Constitution. None of these appellate courts applied the penal code's definition of unlawful, which requires that the act be criminal, tortious, or both. We agree that causing a person to be arrested without authority is serious and requires strict scrutiny. However, we cannot conclude that a judge or police officer who mistakenly interprets the applicable law has committed a crime or tort by arresting a person.

The State's theories in this case, will create precedent for charging police officers with official oppression for the "illegal" or "unlawful" arrests if it is later shown that no probable cause existed or that some other constitutional error has occurred. Here, neither Trevino nor De Luna appealed from appellant's judgments. There is no evidence in the record that any court has found that appellant's court lacked jurisdiction, that she violated double jeopardy, or that she arrested Trevino for an offense he did not commit. Moreover, this precedent could also be used by defendants as a defense for the offense of assault on a public servant. If for example, the arresting police officer's initial arrest is unlawful because that officer lacked probable cause to arrest the defendant, a defendant could cite to this case and argue that the officer had engaged in official oppression, thus, the officer was not engaged in the lawful discharge of his official duties. The State has not argued that by criminalizing official oppression, the legislature intended such a result.

6

analysis, the *Hall* court held that in order for the police officer's acts to be unlawful, it had to be criminal, tortious, or both. *Hall*, 158 S.W.3d 470, 474. Therefore, based on the plain reading of the definition of unlawful in the penal code, and our understanding of what constitutes an unlawful act, as previously stated, the State had the burden of proving that appellant's act of signing the warrants was criminal or tortious. *See* TEX. PENAL CODE ANN. § 39.03. The State, in this case, could not prevail by merely showing that appellant lacked legal authority to act as it has alleged in this case. In addition, the State had the burden of proving beyond a reasonable doubt that appellant knew that her acts were criminal, tortious, or both. *See* TEX. PENAL CODE ANN. §§ 1.07(a)(48), 39.03.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

In a sufficiency review, we examine the evidence in the light most favorable to the prosecution to determine whether any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). The fact finder is the exclusive judge of the facts, the credibility of witnesses, and of the weight to be given testimony. *Brooks*, 323 S.W.3d at 899. We must resolve any evidentiary inconsistencies in favor of the judgment. *Id.*

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Under a hypothetically correct jury charge, a person commits the offense of official oppression, as charged in this case, if the "public servant acting under color of his office or employment . . . intentionally subjects another to . . . [an]

7

arrest . . . that he [or she] knows is unlawful," i.e., that is criminal, tortious, or both.  TEX. PENAL CODE ANN. § 39.03(a)(1).

The definition of unlawful in the penal code, would not include an act that would be criminal or tortious if not justified or privileged.  *See id.* § 1.07(a)(48) (West, Westlaw through 2013 3d C.S.).  Thus, appellant is not guilty in this case, if a justification or privilege existed for her acts.[9]  *See id.*  A party is justified under section 9.21 of the Texas Penal Code when "the actor reasonably believes the conduct is required or authorized by law, by the judgment or order of a competent court or other governmental tribunal, or in the execution of legal process."  *Id.* § 9.21(a) (West, Westlaw through 2013 3d C.S.).  Section 9.21(d)(1) further states that the actor's conduct is justified if the actor "reasonably believes" that "the court or governmental tribunal has jurisdiction or the process is lawful, even though the court or governmental tribunal lacks jurisdiction or the process is unlawful. . . ."  *Id.* § 9.21(d)(1).  A "reasonable belief" is one "that would be held by an ordinary and prudent man in the same circumstances as the actor."  *Id.* § 1.07(42).

## III.    THE STATE'S CASE

At appellant's trial, the State presented testimony from a variety of lay witnesses as to whether appellant's court lacked jurisdiction to issue the warrants for De Luna.  The State also presented testimony from De Luna and Trevino, among others.  The trial court admitted State's Exhibits 1 through 16, which include a variety of documents filed in appellant's court and with the Hidalgo County Sheriff's Office (the "HCSO").[10]  The trial

---

[9] We note that if appellant was in fact justified when she signed the arrest warrants, she could not have known that her acts were unlawful, if they were.

[10] Specifically, we have reviewed, among many other things, the following pertinent documents: (1) An order signed on January 28, 2010 granting De Luna's application for writ of habeas corpus seeking release for lack of probable cause; (2) an order discharging De Luna from custody; (3) documents filed in appellant's court regarding Trevino; (4) documents filed in appellant's court regarding Diaz; (5) documents

8

court also admitted copies of the text of articles 45.057, 45.058, 45.059, and 45.060 of the Texas Code of Criminal Procedure. Appellant presented testimony from several witnesses. The trial court also admitted Defendant's Exhibit 1, which is a memo sent on May 5, 2008 to the Hidalgo County Sheriff's Office requesting that any defendant incarcerated for a *capias pro fine* issued under her authority be released on a promise to appear.[11]

In its opening remarks, the State prosecutor stated the following:[12]

> May it please the Court, opposing counsel, co-counsel. Good afternoon.

---

filed in appellant's court regarding De Luna; (6) a handwritten list of the employees of appellant's court and their respective titles; (7) a handwritten note appearing to detail appellant's actions in Trevino's case; (8) a form from the Hidalgo County Juvenile Center's Probation Department stating that De Luna was placed on Judicial Probation on January 24, 2008 due to contempt of court; and (9) a memo sent on October 8, 2009 from appellant to Guadalupe "Lupe" Trevino, then the Hidalgo County Sheriff, requesting that any person that was incarcerated for a capias pro fine be arraigned.

[11] Article 45.045 of the Texas Code of Criminal Procedure provides that

(b)    A capias pro fine may not be issued for an individual convicted for an offense committed before the individual's 17th birthday *unless*:

    (1)    the individual is 17 years of age or older;

    (2)    the court finds that the issuance of the capias pro fine is justified after considering:

        (A)    the sophistication and maturity of the individual;

        (B)    the criminal record and history of the individual; and

        (C)    the reasonable likelihood of bringing about the discharge of the judgment through the use of procedures and services currently available to the court; and

    (3)    the court has proceeded under Article 45.050 to compel the individual to discharge the judgment.

*See* TEX. CODE CRIM. PROC. art. 45.045 (West, Westlaw through 2013 3d C.S.) (Emphasis added). Neither party provided this statute to the jury. However, this statute establishes that a justice court is authorized, under the circumstances listed, to issue a pro capias fine for an individual who committed an offense when under the age of seventeen.

[12] We have included the State's opening and closing remarks because those remarks are relevant to our understanding of the State's theories as to how appellant's acts were unlawful.

9

In January of last year, 2010, Public Defender Jaime Gonzalez was happening just to go through a list of the jail rosters. He came across a name, Francisco De Luna, and he noticed that he was in jail approximately 18 days on a Class C misdemeanor, raised all types of red flags for him because normally, for him, he notices when somebody is in jail more than 15 days on a Class B misdemeanor. He tries to get them out. They've been in jail too long.

It's his responsibility as a public defender. He's been charged or he's been requested by the County Commissioner's Court to ensure that—that—to make sure that all of those defendants who are in jail, especially those misdemeanor offenses, that they are not spending too much time in jail because we have—we spend so much money every day on these defendants that every time they are in county jail, taxpayers have to pay so much money per day for them and also to protect their rights.

So this is what started the whole thing. And when—about the case, the eventual civil case and the eventual criminal case against Judge Mary Alice Palacios. You're going to find through the evidence—and the evidence is going to be in the form of exhibits and the form of testimony. And those exhibits all are going to come from Judge Mary Alice Palacios's court.

You're going to find that these exhibits are very—they're dismal. But—but the evidence is there nonetheless. And all of this is from her court, all of these exhibits, primarily all of them.

And you're going to notice with Francisco De Luna that he had multiple failure to attend cases, including, also, failure to comply cases, as well, but, regardless, they were all Class C misdemeanors, juvenile offenses.

You're going to find that Judge Mary Alice Palacios signed orders transferring each and every one of [De Luna's] cases, except for the last one, 22 orders transferring. You're going to learn that by doing so, she no longer has jurisdiction of a case. And just like Judge Aida Salinas Flores mentioned during voir dire, a Court must have jurisdiction over a defendant. She waived that jurisdiction by sending all those cases over to juvenile court.

He [De Luna] goes to juvenile court. There is a—at some point there is a letter sent to Judge Mary Alice Palacios's court, this is a letter by the juvenile court that's sent to all public officials, including police departments, that says that the family did not respond to services and the cases are being closed. Nowhere on that letter is there a signature by the judge transferring the case back, nothing of that nature.

Francisco De Luna goes to juvenile court, he's put on probation for the cases that Judge Mary Alice Palacios transfers up to juvenile court, he does his time, [and] he does his juvenile probation. The day—or close around about the time he turned 17, Judge Mary Alice Palacios issues out what's called a birthday letter under 45.060 [of the Texas Code of Criminal Procedure[13]]. It's one of the statutes you got to view during voir dire.

And that letter, she sends it out, and then she has him arrested. He was originally supposed to spend, according to her—her order of arrest—she adjudicated him to arrest. He was supposed to spend 100 and some odd days for about $10,000 worth of fines. She stacked all of the fines in the cases he had been in her court for, even though she knew she had already transferred the cases. How do we know she knew? She signed 22 orders transferring.

---

[13] Article 45.060 appears in the Texas Code of Criminal Procedure chapter forty-five, subchapter B, which sets out the procedures for justice and municipal courts. Article 45.060 states:

Unadjudicated Children, Now Adults; Notice on Reaching Age of Majority; Offense

(a)   Except as provided by Articles 45.058 and 45.059, an individual may not be taken into secured custody for offenses alleged to have occurred before the individual's 17th birthday.

(b)   On or after an individual's 17th birthday, if the court has used all available procedures under this chapter to secure the individual's appearance to answer allegations made before the individual's 17th birthday, the court may issue a notice of continuing obligation to appear by personal service or by mail to the last known address and residence of the individual. The notice must order the individual to appear at a designated time, place, and date to answer the allegations detailed in the notice.

(c)   Failure to appear as ordered by the notice under Subsection (b) is a Class C misdemeanor independent of Section 38.10, Penal Code, and Section 543.003, Transportation Code.

(d)   It is an affirmative defense to prosecution under Subsection (c) that the individual was not informed of the individual's obligation under Articles 45.057(h) and (i) or did not receive notice as required by Subsection (b).

(e)   A notice of continuing obligation to appear issued under this article must contain the following statement provided in boldfaced type or capital letters:

"WARNING: COURT RECORDS REVEAL THAT BEFORE YOUR 17TH BIRTHDAY YOU WERE ACCUSED OF A CRIMINAL OFFENSE AND HAVE FAILED TO MAKE AN APPEARANCE OR ENTER A PLEA IN THIS MATTER. AS AN ADULT, YOU ARE NOTIFIED THAT YOU HAVE A CONTINUING OBLIGATION TO APPEAR IN THIS CASE. FAILURE TO APPEAR AS REQUIRED BY THIS NOTICE MAY BE AN ADDITIONAL CRIMINAL OFFENSE AND RESULT IN A WARRANT BEING ISSUED FOR YOUR ARREST."

*See id.* art. 45.060 (West, Westlaw through 2013 3d C.S.).

That individual who was in here, he would have spent a long time in the county if it hadn't been for Jaime Gonzalez seeing the injustice. So essentially, Ladies and Gentlemen, what we discussed during voir dire, double jeopardy violation of a Fifth Amendment right. He served two punishments for the same crime. There is no getting around orders to transfer. That's just one.

. . . .

The last one Leroy Trevino. This is an individual who did everything and appeared every time he was supposed to report. He appeared multiple times. He was told to go to—he was put under full disposition.

And then eventually—when he was told to come back, he came back every time and, actually, there is a notation in his file that says the case was going to be closed by her court staff because he was doing everything he needed to do. And then the next entry says, no, he needs to pay court costs and fines. There is eight months of inactivity on this file, eight months of inactivity.

A birthday letter is sent out, sent out, and he appears. He appears at her court. We know that because it's in the file. Yet she still arrests him for failure to appear even though he showed up on the date the summons told him to. It will state on the warrant, failure to attend school, and in parenthesis it will say FTA. According to her court staff, that's failure to appear. Regardless if they say otherwise, it's failure to attend school.

Remember the statutes we read during voir dire. You can't jail them for those fines because those are juvenile cases.

Ladies and Gentlemen, we bring these three before you and ask you that you not judge those individuals for their actions. We're here on Judge Mary Alice Palacios. And I know that you would want the same rights for yourself and your children and everybody else you know. Everybody has a fair trial, including the judge. It should be the same way those individuals who appeared before her.

They came with their parents before her. Pay up or you're going to jail, no ifs, ands or buts. I don't understand. Why do I have to pay when I'm on deferred? Why am I going to have to suddenly pay? Why am I being subjected to arrest? Just take him away.

Ladies and Gentlemen, she knew the law. He appeared before her, and he was arrested. Those are constants. The orders are constants, the summons are constants. They cannot change at all.

12

The witnesses that you will hear, the majority of them, are all her court staff. They are very loyal to her. But they are State's witnesses because we have to have them to testify. I just want you to remember that. Just because they're State's witnesses—they are still employed by her office. And a lot of those people that you saw in here come in—she has 20 some odd employees.

There is going to be a lot of testimony, I'm sure, that she has a big docket. You're going to learn that she goes out and recruits—and recruit business, recruit truancy, failure to attend cases, from the school districts.

When someone goes out and runs for this position, gets paid quite a bit of money from Hidalgo County, goes out and tries to round up more business from school districts and also more monies from them, she knows the law.

We don't know why she's doing this, bending the law to her favor, but it was happening, and the evidence is there. The law is there. We are confident when you look at these documents and hear testimony, the law—the law, you will find Mary Alice Palacios guilty of three counts of official misconduct. Thank you.

## A. The Chief Public Defender, Jaime Gonzalez

Gonzalez testified that the Public Defender's Office of Hidalgo County "absorb[s] currently 40 percent of the caseload in misdemeanor cases" and that he reviews the jail roster log in order to assist defendants who are in jail for misdemeanor offenses to get out of jail as quickly as possible. Gonzalez stated that his office "normally" "covers Class A and Class B misdemeanors." According to Gonzalez, Class C misdemeanors are fine-only offenses. Gonzalez stated that he was reviewing a client's case who had committed a Class C misdemeanor, and he was conducting a "random check[]" of the jail roster because "people fall through the cracks and even though they're disposed of, they should be released, they remain in custody." Gonzalez testified that while he was checking on his client,[14] he discovered that De Luna had been in jail for eighteen days for similar

---

[14] Jaime Gonzalez could not recall his client's name. Gonzalez explained that he recalled that his

13

reasons as his client.[15] Gonzalez believed that De Luna had been confined due to warrants that appellant had issued. Gonzalez could not recall exactly how long De Luna had been ordered to stay in custody but believed De Luna was required to serve approximately fifty or sixty days. Gonzalez stated that De Luna told him that he had "roughly, $8thou [sic] or so of fines, and he could not pay it and that he was told if he could not pay it, he had to serve time in jail."

According to Gonzalez, he reviewed the Texas Code of Criminal Procedure and stated, "[I] basically just did a—in my opinion, a quick look over, if there was anything that I could see that if this was correct under the law." The prosecutor then asked, "So once you determined that he was in there improperly, what did you do?" Gonzalez responded, "At that point I—again, I wasn't confident of my interpretation of—of the Juvenile Code section, so I contacted Eric Schreiber with the District Attorney's Office to explain to him my position of my concern with Mr. De Luna and the other [unnamed] individual, their incarceration, and I—that was the next thing."[16] Gonzalez testified that "Mr. Schreiber . . . considered it a gray area. He didn't—he didn't understand what I was saying either. We were kind of talking back and forth, so with Mr. Schreiber, I know that Mr. Schreiber and myself wanted to speak to Homer Vasquez with the District Attorney's Office.[17] And I again explained my position on the interpretation of the law."

---

client's cases had arisen out of the Justice of the Peace Court, Precinct 4, Place 2 appellant's court.

[15] Gonzalez did not elaborate.

[16] Eric Schreiber did not testify at trial.

[17] Homer Vasquez did not testify at appellant's trial.

14

Gonzalez stated that after conferring with the other men, he filed a petition for writ of habeas corpus requesting that De Luna be released because he was being held improperly. Gonzalez testified that he filed the writ of habeas corpus because he "believe[d De Luna] was in custody illegally and that is the order to the [c]ourt, and it was granted by Judge Rudy Gonzalez."[18] The trial court admitted the orders signed by the District Court judge granting habeas corpus relief and ordering that De Luna be released from jail. The trial court overruled defense counsel's objections to the orders on the bases that: (1) they were not relevant to the arrest issue because the orders concerned confinement issues; and (2) admission violated rule of evidence 404(b).

Gonzalez admitted that he did not review the documents that were filed in appellant's court regarding De Luna. Gonzalez stated he did not conduct an investigation into the facts, and "[i]t was just a cursory review of the law and what [he] saw off the criminal case management system, Able Term, on my computer, basically." According to Gonzalez, the Able Term system documented that De Luna was arrested "for possession of marijuana, a Class B misdemeanor." When the prosecutor asked, "And then he was—then that case [the marihuana possession case] was taken care of. . . . And then he was arrested on those [juvenile] offenses," Gonzalez replied, "He was arrested for possession of marijuana, Class B misdemeanor, and he disposed of the case and he continued to remain in custody on the [juvenile] offenses listed in [State's] Exhibit No. 2."[19]

---

[18] Although the trial court admitted the order granting De Luna's writ of habeas corpus, in this case, the State did not seek admission of the reporter's record of the habeas corpus proceeding.

[19] The offenses listed in State's Exhibit 2 include the following: (1) eight counts of "Failure to Comply with Directive—Class C Misdemeanor," one count with a fine of $407.00 and the others each with a fine of $416.00; (2) one count of "Excessive Tardies—Class C Misdemeanor" with a $407.00 fine; (3) ten counts of "Fail to Attend School—Class C Misdemeanor" each with a fine of $533.00; (4) three counts of "Abusive Language in School—Class C Misdemeanor," each with a fine of $416.00; (5) one count of "Disruption of Class—Class C Misdemeanor," with a $416.00 fine; and (6) one count of "Rules and

15

The prosecutor asked, "And in order for him to have been in custody on those offenses, he had to have been originally arrested for those," Gonzalez responded, "Correct." Gonzalez believed "[f]rom what [he] saw" that De Luna committed all of the offenses before he turned seventeen and that De Luna was arrested for those offenses.

When asked to describe his understanding of "double jeopardy," Gonzalez said,

My understanding is when a person is accused of a crime, when he—either when he's acquitted or found not guilty in a trial or there is a conviction, he cannot be retried in a trial or there is a conviction, he cannot be retried for the same crime or a similar crime after he's been acquitted or convicted.[20]

Gonzalez agreed with the prosecutor that double jeopardy encompasses "multiple punishments for the same crime."

The State asked Gonzalez if he was "aware of where Mr. De Luna was arrested," and Gonzalez replied, "I am not aware exactly where he was arrested. I know that he was originally arrested for a possession of marijuana charge." Gonzalez testified that he spoke with appellant about De Luna's case and that appellant "had a different interpretation than" his own interpretation of the "two article sections" they discussed. The prosecutor asked if appellant was "angry." Gonzalez replied, "I wouldn't say she was angry, but she was—I recall that she did—she was forceful, raising her voice and her position, defending her position."

On cross-examination, Gonzalez stated that he did not know that there were twenty-two warrants for De Luna's arrest. Gonzalez knew that there were ten offenses

---

Penalties—Class C Misdemeanor," with a $416.00 fine.

[20] The trial court admitted Gonzalez's testimony regarding his understanding of double jeopardy after overruling appellant's objection that Gonzalez was not designated an expert witness. The trial court explained that the State designated Gonzalez as a witness and all parties were aware that he is a lawyer. The trial court also took judicial notice that as a lawyer, Gonzalez has "specific knowledge and understanding" of double jeopardy.

16

related to failure to attend school. Gonzalez agreed with appellant's defense counsel that in a criminal case, the accused will make several appearances in court. Appellant's defense counsel asked, "Now, sir, tell the jury what a judge can do if an accused individual fails to make any of those appearances?" Gonzalez replied, "A judge can order what's— an order for their arrest for failure to appear [in court]." Gonzalez did not know who would have had the obligation to notify the accused that he was summoned to appear in court, but he "believed" the notice would come from either the "County Clerk's Office or from the actual court." Gonzalez testified that an accused has an obligation to keep the authorities "apprised" of his address. Gonzalez explained that he wanted Schreiber's opinion regarding De Luna's situation because Schreiber was a prosecutor in appellant's court. When appellant's trial counsel asked Gonzalez if appellant had issued the warrants for De Luna's arrest for his failure to appear, Gonzalez said, "The warrant that I saw, the ten that are listed on Exhibit 2, were for failure to attend school, from what I saw, and other charges, abusive language, I believe is one of them, I can't remember exactly."[21]

On re-direct examination, the prosecutor stated, "Now, you're not familiar with JP law or Municipal Court law, are you?" Gonzalez responded, "I am not familiar with it [especially when it comes to juveniles]." Gonzalez testified that he does not "handle" truancy or failure to attend cases. The prosecutor then published article 45.060(a) of the Texas Code of Criminal Procedure and asked Gonzalez to read it. Gonzalez said, "It says, A, Except as provided by Articles 45.058 and 45.059, an individual may not be taken

---

[21] The State and Gonzalez interpreted the "FTA" notations differently. In Trevino's case, the State alleged that "FTA" meant that the warrants were issued for failure to appear in court. Gonzalez stated that none of the warrants in De Luna's case were for failure to appear in court, although all of the warrants in De Luna's case have the "FTA" notation.

17

into secured custody for offenses alleged to have occurred before the individual's 17th birthday." The prosecutor asked, "Okay. Now, the offenses in which you have said that the defendant [De Luna] was arrested on and—and detained were on offenses he committed before his 17th birthday?" Gonzalez replied, "That was my—that was my interpretation, yes."

On re-cross examination, Gonzalez stated that a person is considered an adult when he or she turns seventeen and agreed that a person who is seventeen can be placed in "secured custody" and go to jail. Gonzalez recalled that all of the offenses occurred when De Luna was younger than seventeen. Gonzalez stated that he did not know when appellant issued warrants for "the failure to appear offenses."[22]

## B. Appellant's Court Coordinator, Roberto Leal

Leal testified that he had worked as the court coordinator for appellant's court for approximately seven years. Leal stated, "I pretty much handle a variety of things, the scheduling of her dockets, civil, criminal, you know, truancy court dates." On cross-examination, Leal explained that appellant's court "has a civil docket which have to do with small lawsuits under [$]10,000, evictions. Lately we're doing towing hearings, unlawful towing. We do justice civil courts, we do peace bonds, we do criminal traffic" and death inquests.

Leal testified that appellant was required to have eighty hours of training in her first year on the bench and then she was required to attend twenty hours of training every

---

[22] Previously, when asked if appellant had issued the warrants against De Luna for his failure to appear, Gonzalez stated, "The warrant that I saw, the ten that are listed on Exhibit 2, were for failure to attend school, from what I saw, and other charges, abusive language, I believe is one of them, I can't remember exactly."

18

year. Leal agreed that the majority of appellant's cases were truancy cases. Leal explained "the process that a person goes through when they are accused of being truant" as follows:

It goes from the filing of a case, whether it's a juvenile or an adult, either in the form of a complaint or a citation, and it gets given a docket number. It's processed. And a process, we mean—I mean it's input into the system of Able Term, as the County uses it through our clerks, the truancy clerks. From there on out, it's taken to the case managers, and we send up the ticket—if it's a ticket, for the most part, a court date is already on the ticket that's signed by the juvenile or the defendant, in particular, whether it's a juvenile or an adult. When it's a complaint, we send out to— a summons to the address that's provided to us once it's filed. If—if it's a— and that's on a complaint or a ticket.

Once we go to court, everybody signs in, everybody gets the parent—the parents, if it's a juvenile, they have sign-in sheets to get their information, to get John Doe's mother's name, their date of birth, their current address. They fill it out for us so we can put it in the file, and if for whatever reason they have to come back, at least that's what we know that we have for them. Once they are seated in, the Judge would admonish them, once they are all there, give them their rights, whatnot.

From there on out, the case managers would get the file, start looking through them to see which ones are their first times there; first timers I mean they've never been in trouble before, it's the first time they appear in court and just talk to the parents. Everything was a case-by-case basis.

They would also assess the cases that were set for status. These were people asked to come back under Court order to see how they're doing, to do a checkup. You know, they were all referred for a drug test to see if anyone were positive or negative, just so we can narrow down why they're being truant. If they're positive for drugs, we can focus on that. If they were negative, they would do community service at the Boys and Girls Club Teen Court, you know, but that's pretty much how the process was.

Everything was on a case-by-case basis. If they are asked to come back, it varies. It would vary if they didn't come back. I mean, it's a big process.

Leal explained that once the child comes into the court on a charge of truancy, that child is read his rights and enters a plea of guilty or not guilty. Leal stated that if the child

pleads guilty, the court defers disposition and puts the child on probation. If the child complies with the conditions of probation, then "there is [sic] no court fees that are actually collected if he is compliant." The judgments are written, and the conditions are provided in writing to the child.

Leal stated that as the judge, appellant would sign the orders that the child was responsible for following. "The case managers would assess the cases. . . . If they would say they need to do Teen Court or whatever that they—the person or the defendant was asked to do by a case manager, and the judge would enforce the judgment if she agreed with that." Leal agreed that only the judge has the authority to issue a fine and enforce the conditions. However, the case managers would make recommendations and fill out the paperwork. "Signing the judgment would be the judge. Of course, she would look over them before to make sure everything was where it was supposed to be, and the case managers would fill out, if they could, and not leave the judge on the stand."

Leal explained that "deferred adjudication" occurs when the defendant is "put on probation from the date of judgment," and there are several conditions "just on truancy that she can ask you to be on throughout probation. The probation can vary from one month, two months, [or] three months. What it is [] that during that deferral period, whatever the time frame may be, the judge is—if [the defendant] complied again, the original fine assessed is waived, which is the County fine." Leal agreed with the prosecutor that in deferred adjudication situations, the fine was also being deferred. Leal testified that court costs are not deferred and are mandatory according to the county auditors because court costs are only waived if the district attorney's office dismisses the case.

Leal stated that if the defendant did not comply with the conditions, the defendant is "brought back to court, and we had—we work with several agencies so they give us stats, statistics on—John Doe was referred and he hasn't gone, even though it was on his judgment." The defendant is then "brought back" to the court for a "show-cause hearing" where the defendant is asked to explain to the judge his or her reasons for not complying with the conditions of probation.

On cross-examination, appellant's defense counsel asked, "Are you able to tell the jury how many of [25,000 to 26,000 children in the] truancy cases" that appellant presided over came back to appellant's court, Leal said, "You would—honestly between those cases, you could say that—I would say maybe a fourth or maybe half, towards the middle, come back. Other first-timers we never see again." Leal stated that the "success rate of the truancy program conducted by" appellant is "about 89 to 90 percent success rate based on statistics [the court] receives from the other agencies, which are New Beginnings and Teen Court."

Defense counsel then asked Leal to review the documents admitted into evidence regarding De Luna's case. Leal agreed that there were "about" twenty-five truancy exhibits regarding De Luna. Leal reviewed Exhibit 90 and described it as "a warrant for Francisco De Luna." Leal testified that the Edinburg Consolidated Independent School District had filed in appellant's court a complaint alleging that De Luna had failed to attend school. Warrants had then been "drafted and done in [the court's] office." Leal testified that the records also contained three letters that were "FTA, which is failure to appear." When asked if the warrant was for failure to appear, Leal replied, "It's more for a case manager, but, I mean, it runs the same as ours. You could say that they failed to appear

21

for that original court setting that they were asked to as an adult." Leal testified that based on the documents, De Luna failed to appear "about 23, 22, 23, yes" times.

Leal explained that they mail the notices to the defendant's residence at the addresses provided by the school districts and that it is the defendant's duty to keep the court informed of his or her change of address. Citations are sent to the defendants telling them when and where to appear. Leal testified that based on the documents before him, De Luna and his mother missed the court dates that they were ordered to attend. Leal stated that without the paperwork, he has no independent recollection of De Luna.[23]

Defense counsel asked Leal to explain appellant's philosophy regarding the truancy cases. Leal said:

> Judge Palacios is not so much about collecting revenue. As far as these cases go, if you want to run numbers on how many delinquent—or how many fines we have out there for students that haven't appeared, we have a lot to collect. If anything, it's about getting kids back in school, you know, for the most part because nothing is collected. And to say that Jane Doe or John Doe was in court—we didn't collect anything there, no. Everything waits after the case is finalized, whatever the outcomes may be, but it's more about having these kids go to school, and if they have a drug problem, to take care of that, a family problem, to take care of that. It varies.

Leal explained that the forms that are used in appellant's court are approved by the "D.A.'s office . . . particularly Eric Schreiber because he is the ADA that's assigned to our court. You know, that's who we have gone to for the most part if anything—we have questions in reference to a particular case or circumstances of a case." According to Leal, Schreiber "never" alerted him "to any potential problems" concerning the truancy cases in appellant's court.

---

[23] Leal also testified regarding Diaz's documents.

On re-direct-examination, the prosecutor asked Leal to review the documents related to De Luna's case in appellant's court. Leal established that appellant signed an order transferring De Luna's case to the juvenile court on March 8, 2007, issued the "birthday letter" on December 17, 2008, and issued the warrant for De Luna's arrest on January 21, 2009. Leal agreed with the prosecutor that a notation regarding the transfer of De Luna's case to juvenile court appeared on the docket sheet. Leal clarified that there were twenty-two orders of transfer in De Luna's case. The prosecutor asked, "All these cases are on this birthday letter for basically notifying them, setting them up to get arrested when he turns 17 for the same offenses that were transferred to juvenile court. Are all of these the same cases?" Leal responded, "Yes, ma'am."

Leal acknowledged that State's Exhibit 9X did not include "anything about [an] order transferring [De Luna's] cases back" to appellant's court. State's Exhibit 9X is a document from the Hidalgo County Juvenile Center entitled, "Disposition." It states, in relevant part, that "On 3/23/07 a referral was received" from appellant's court regarding De Luna's alleged "contempt of court." The document states, "Please be advised the following action has been taken." The document then lists several possible actions. However, none of these actions are checked. Instead, in a section entitled "Additional Information," the document states in hand writing the following: "[The] family did not respond for services." The document is signed by a juvenile probation officer.[24] On re-cross examination, appellant's trial counsel asked if State's Exhibit 9X was sent in response "to your requests or to Palacios's requests to appear in your court on this case,"

_____

[24] We are unable to determine who signed the document because the signature is illegible.

23

Leal said, "No." On re-direct examination, Leal agreed with the prosecutor that State's Exhibit 9X was sent before the transfer of De Luna's cases to juvenile court.

## C. Appellant's Former Case Manager, Marcela Adela Cherry

Cherry testified that she is currently employed with the Texas Attorney General's Office as a field investigator. Cherry began working in that office on December 13, 2010. Prior to that date, Cherry worked in appellant's court as a case manager. Cherry held that position from "September of 2008 up until December of 2010." Specifically, Cherry handled "[t]ruancy or school-related offenses." Cherry said, "The majority of the training [that she] received was on-the-job training" from appellant. The prosecutor asked if Cherry was aware that appellant "signed arrest warrants for failure to appear for those who turn 17," and Cherry replied, "After a notice for continuing obligation was mailed . . . . Yes." Cherry could not tell the jury how many of the notices had been mailed from appellant's court to defendants.

When asked by the prosecutor, Cherry identified State's Exhibit 9A as "a notice of continuing obligation." Cherry read the notice as follows:

> Our court records reveal that before [your] 17th birthday, you were accused of a criminal offense and have failed to make an appearance or enter a plea in this matter. As an adult, you are notified that you have a continuing obligation to appear in this case. Failure to appear as required by this notice may be an additional criminal offense and [may] result in a warrant being issued for your arrest.[25]

Cherry acknowledged that there was an order transferring De Luna's cases from appellant's justice court to the juvenile court. The prosecutor asked, "Once this order is signed and the case is transferred—once this order is signed, the judge, Mary Alice

---

[25] This notice tracks the language of article 45.060 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 45.060.

Palacios, loses jurisdiction; isn't that right?" Cherry responded, "It's my understanding that at least for a time being she does." The prosecutor asked, "What's the time being," and Cherry said, "Well, if the juvenile probation sends us a letter back saying that they are not going to take on the case, we—we, in a sense, keep it again."

The prosecutor asked Cherry to review the documents included in State's Exhibit 7A and 7B. [26] Cherry said that a "commitment order" signed by appellant appeared in the documents included in State's Exhibit 7A and explained that she understood that a "commitment order" signed by a justice of the peace "commit[s] that person to jail for a

_____

[26] State's exhibits 7A and 7B contain over thirty pages of documents. It is unclear exactly which documents Cherry reviewed during her testimony. However, we have reviewed all of the documents in State's Exhibit 7A, which include: (1) the docket sheet for Trevino's case; (2) two forms from appellant's court regarding Trevino's case with handwritten notes (the handwriting is messy and in some places indecipherable); (3) a "Student Information" form, received in appellant's court on February 11, 2008, with an absent record log showing that Trevino was absent from school on January 21, 22, 24, 28, and February 1, 4, 5, and 6; (4) a referral for failure to attend school classes from Tiburcio Canas regarding Trevino's absences from school; (5) a complaint signed by Canas alleging that Trevino failed to attend school for three or more days or part of days in a four week period; (6) Canas's affidavit stating that Trevino failed to attend school; (7) three summons from appellant's court to Trevino's parents informing them that Trevino had to appear in her court on March 13, 2008, April 10, 2008, and October 16, 2008; (8) the "birthday letter" sent from appellant's court to Trevino ordering him to appear on August 4, 2009; (9) a "Notice to Show Cause for Failing to Obey Deferred Disposition Order"; (10) an order for Trevino to "pay the entire fine and costs adjudged at the end of this hearing"; (11) a "Waiver of Alternative Sentencing and Request for Incarceration in Satisfaction of Fine and Costs" signed by Trevino; (12) an order of commitment issued by appellant stating that Trevino should remain in custody "for the time required by law to satisfy the amount of" his fine of $537.00; and (13) a warrant to arrest Trevino issued by appellant.

We have also reviewed the documents in State's Exhibit 7B which include the following: (1) case manager's notes regarding Trevino's case; (2) two forms from appellant's court with handwritten notes regarding Trevino's case; (3) an affidavit signed by Canas stating that Trevino had failed to attend school; (4) a complaint signed by Canas; (5) a "Student Information" form with an absent record log showing that Trevino had been absent on February 7, 8, 11, 12, 13, 18, 19, 20, 21, 28, 29 and March 3, and 6 , which was received on March 11, 2008 by appellant's court; (6) a "Referral for Failure to Attend School Classes" from Canas to appellant's court regarding Trevino; (7) "Minutes of the Justice of the Peace Court" deferring Trevino's adjudication; (8) a summons for Trevino to appear in appellant's court on October 16, 2008; (9) a "birthday letter" summoning Trevino to appear in appellant's court on August 4, 2009; (10) a "Notice to Show Cause for Failing to Obey Deferred Disposition Order"; (11) Trevino's report card from October 15, 2008; (12) Trevino's "Report card/Progress Summary" for April 14, 2008 to May 30, 2008; (13) Trevino's "Report Card" for August 25, 2008 through October 3, 2008; (14) an order from appellant's court ordering Trevino to "pay the entire fine and costs adjudged at the end of this hearing"; (15) a commitment order issued by appellant; (16) a warrant for Trevino's arrest issued by appellant; and (17) a "Waiver of Alternative Sentencing and Request for Incarceration in Satisfaction of Fine and Costs" signed by Trevino.

25

specific charge." Cherry stated that the specific charge against Trevino was "Failure to attend school, failure to appear." Cherry explained that the "Notice of continuing obligation" would have been sent before the individual could be arrested for failure to appear. Cherry had never heard the "notice of continuing obligation" referred to as "a birthday letter."

Cherry testified that she did not know why Trevino was arrested and that she believed that he did appear on the date he was required to appear. Cherry believed that there was a clerical error on the documents included in State's Exhibits 7A and 7B. When the prosecutor asked, "So what was he arrested for, then," Cherry replied, "there was a waiver that he, I guess, declined to do community service or waive any other type of— waive any other type of alternative sentencing." Cherry agreed with the prosecutor that by signing the waiver, Trevino asserted that "he couldn't pay the fine, essentially, and so because he couldn't pay the fine, he had to go to jail, right?" The following exchange then occurred between the prosecutor and Cherry:

Q    He appeared on August 4th, 2009, yet, the warrant says failure to attend school, FTA, and the FTA, it is your representation, stands for failure to appear?

A    That's correct, yes.

Q    So if you're saying it was a clerical error and he was obviously incarceration [sic] and arrested by Judge Mary Alice Palacios on August 4, 2009, what was he arrested for, then?

A    I would—I don't know if I can answer that question, but my understanding would be then that he was there for the failure to attend school, but to satisfy the fines and costs of that.

Q    Oh, so it's going back to an offense he committed prior to the age of 17 then? Is that what your testimony is now?

A    Right.

26

. . . .

Q     Okay. Now, you are aware, though, that an individual who is 17 cannot be jailed for offenses that happened prior to his 17th birthday, correct?

A     Yes, ma'am.

Cherry testified that according to the case manager's notes regarding Trevino's case, he was doing well, and it had been recommended that his case be closed in October of 2008 when he completed his probation. Cherry stated that the period of probation in Trevino's case could only be set for a maximum of six months and that there was no document or order in the record indicating that his probation had been extended. Later, Cherry clarified that the docket sheet indicated that Trevino's probation had been extended. Cherry agreed with the prosecutor that although the probationary period had ended, the court could reset the cases beyond the six months. Cherry agreed that in Trevino's case, appellant ordered Trevino to pay the fines, he was unable to do so, Trevino signed a waiver, he was arrested in appellant's courtroom, and appellant committed him to jail. Cherry testified that the order sent to Trevino to appear in appellant's court was sent ten months after he completed the terms of his probation.

Cherry explained that the reason there were two cause numbers related to Trevino's case is because "it's assigned a juvenile—a juvenile cause number and then an adult cause number." Cherry agreed with the prosecutor that there was only one judgment in the court's file and that the only judgment on file indicated a probationary period of six months. When asked if the judgment included a fine, Cherry replied, "No, I didn't see any." Cherry agreed that in "November [Trevino was] ordered to pay a fine and

27

court costs." However, Cherry could not recall if the case sheet or the docket sheet reflected imposition of the fine and court costs.

Cherry stated that "the notice of continuing obligation birthday letter" went out on July 22, 2009 ordering Trevino to appear in appellant's court on August 4, 2009. Cherry agreed that Trevino appeared on that date. Cherry agreed that appellant signed the warrant for Trevino's arrest on the "failure to attend school, failure to appear." Cherry stated she believed that, according to the docket sheet, Trevino appeared every time he was summoned to appear in appellant's court.

On cross-examination, Cherry testified that Trevino would have been told that he could pay the fine and court costs at a later date, that a payment plan could have been arranged, and that he could perform community service in lieu of paying the fine. Cherry stated that based on Trevino's signature on the waiver, he had chosen to go to jail and not pay the fine or perform community supervision. Cherry explained, that although a case manager recommended that Trevino's case be closed, appellant made the final decision whether to close the case. Cherry stated that appellant apparently had not accepted the recommendation because according to the case manager's notes, Trevino had additional absences. Defense counsel asked if Cherry agreed that Trevino was told he had to immediately pay the fine or go to jail, and Cherry disagreed.[27] Cherry clarified that the language used in the warning that is included in the "birthday letter" or what

_____

[27] Defense counsel's questions appear to be in response to the prosecutor's questions characterizing appellant's actions as demanding immediate payment from Trevino and sending him to jail when he could not pay the fines and court costs.

28

Cherry referred to as the notice of continuing obligation came "straight out of the [Texas] Code [of Criminal Procedure]."[28]

Cherry testified that most of the forms used in appellant's court were provided by the Justice Training Center, which is the same agency that trains the justices of the peace in Texas. Cherry stated that the other forms that were not provided by the Justice Training Center had been approved by the District Attorney's Office. Cherry testified that Schreiber handled all of the cases in appellant's court where the defendant pleaded "not guilty," which included "failure to attend cases." According to Cherry, Schreiber never expressed that there was a problem with the procedures followed in appellant's court. Cherry testified that she presented the notice of continuing obligation forms to Schreiber before she sent them to the defendants and that Schreiber never expressed a concern with the forms. When asked if any of the forms used in appellant's court were created by "her office," Cherry replied, "Not to my knowledge, no."

On re-direct examination, the prosecutor asked, "[I]sn't it true that Judge Mary Alice Palacios was going to Valley View, Hidalgo and Donna ISD and recruiting truancy work?" Cherry responded, "Recruiting work, I've never seen that, no." Cherry elaborated, "Well, actually, I was approached by the attendance clerk for Valley View when I just started, a few months after I started, and they told me that they had seen an article in the paper for what [appellant] was doing for the [ECISD]."

Cherry agreed with the prosecutor that appellant's staff writes in the information regarding the defendant on the "birthday letter." The prosecutor asked, "You could

---

[28] A copy of article 45.060 of the Texas Code of Criminal Procedure was admitted at appellant's trial as State's Exhibit 3. *See* TEX. CODE CRIM. PROC. ANN. art. 45.060.

actually put my name in there and say I failed to appear, couldn't you? You could put that in the birthday letter if you wanted to? Yes or no?" Cherry said, "No, you can't do that."[29]

The prosecutor asked, "So essentially the way that [defense counsel] is insinuating it and the way you are answering his questions, LeRoy Trevino was arrested on a clerical error," and Cherry responded, "No, he was not arrested on a clerical error." Cherry agreed with the prosecutor that the commitment and warrant documented that Trevino was arrested for failure to appear.

The prosecutor asked Cherry to read articles 45.041 and 45.048 of the Texas Code of Criminal Procedure silently. After following the prosecutor's directions, Cherry agreed that "the word community service" did not appear in the articles. On re-cross examination, Cherry explained that the code of criminal procedure did not authorize the imposition of community supervision or an option to pay at a later date but that appellant "wanted to [do] it for them." Cherry agreed with defense counsel that Trevino "said no" to any alternative sentencing. Cherry stated that the organizations where the "young people" could perform community service included "the Humane Society, the library, Boys and Girls Club. There were so many. The museum. There were so many places that they could perform the hours."

**D. Trevino**

Trevino testified that he was eighteen years old at the time of appellant's trial. When asked why he was cited for truancy, Trevino said, "I just wasn't going to school."

---

[29] The prosecutor also asked, "Okay. These, essentially—these birthday letter, notice of continuing obligation letters, they are basically weapons that you can use at your disposal, isn't it?" However, after defense counsel objected, the prosecutor stated, "Withdraw the question, Your Honor." The State presented no evidence that appellant used the obligation letters as "weapons" for any purpose.

Trevino testified that while he was attending high school in McAllen, he was transferred to alternative school in Weslaco. According to Trevino, someone from McAllen caused a problem on the bus, and thereafter, no one from McAllen was allowed to ride the van that transported the McAllen students to Weslaco. Trevino stated that he could not find a ride to Weslaco and that is why he was absent.

Trevino testified that appellant told him to pay a fine, and his parents would pay a portion of the fine every time they appeared with him in appellant's court. Trevino did not receive any receipts for payment and did not receive "a piece of paper telling [him] what [he] had to do." Trevino testified that he "always appeared" when he was summoned to appear in appellant's court.

Trevino recalled receiving a letter when he turned seventeen informing him that he "had to go to court and take care of some payment plans that [he] hadn't taken care of or [he] was going to be arrested." Trevino stated that he went to court, and he was arrested "[b]ecause he hadn't finished paying off [his] fines." Trevino believed that he owed about $1,000.00 in fines, but he did not have any money at the time. When the prosecutor asked, "Were you offered community service," Trevino replied, "No, ma'am. My mother was." The prosecutor asked why Trevino had chosen to go to jail; he responded, "Because it was my behalf, you know what I mean? It was my mistake so I was going to have it." Trevino stated that he spent "[m]aybe like a week and a half" in county jail after he was arrested.

On cross-examination, Trevino agreed that appellant had placed him on probation and had ordered him to pay a fine. Trevino did not pay the fine, and appellant gave him the option of additional time to pay the fine. He refused that option. Trevino agreed that

31

while he was on probation for his truancy, he had the option of paying the fine in installments but was not able to make those payments.

On re-direct examination, Trevino testified that appellant ordered his mother to serve community service hours and "extended [his] six-month probation to a nine-month." Trevino claimed that appellant threatened to "lock up" his disabled mother for his truancy and that his mother cried.

## E.    De Luna

De Luna testified that he was nineteen years old at the time of appellant's trial. De Luna recalled that when he was in high school at "Johnny Economedes," he "was missing too much school" and was "told to go to court." When asked, "And did you go to court," De Luna said, "Not all the times." De Luna testified that he went to appellant's court twice. De Luna recalled that he went to a different court that ordered him to serve probation; he served and successfully finished his probation. De Luna believed that once he completed the probation, he "thought it was over" because that is what his probation officer told him. De Luna testified that he had approximately twenty tickets and that he had "to serve the time" in jail for all of those tickets. De Luna spent eighteen days in jail.

On cross-examination, defense counsel asked, "Okay. And out of the 22 citations, you only went to court on two of them; is that right," De Luna said, "Yes, sir." De Luna agreed that he received notices from the judge to appear in court when he received the tickets, but he "just didn't go." De Luna testified that his mother wanted to take him to court, but he would not go.

De Luna acknowledged that he had a pending federal lawsuit against appellant, but denied that he was asking for money. De Luna admitted that the $10,000 or $11,000

fine he was ordered to pay was not paid. When defense counsel again asked De Luna if he was seeking money damages in his federal lawsuit against appellant, De Luna said, "Well, money damages. . . . Yes, sir."

## E.    De Luna's Mother, Elsa De Luna

Elsa testified that De Luna was diagnosed with A.D.H.D. in third grade. She added that De Luna "has had a lot of learning disorders." Elsa stated that De Luna began getting in trouble for truancy "shortly after his father died." Elsa testified that she appeared once with De Luna in appellant's court where he was ordered to pay a fine. Elsa said that they went to appellant's court two other times, "but she was not there, so they told [her] that they would contact [them] both times, and then after that, they never contacted [them], but, that was, like, years after."

Elsa testified that De Luna went to juvenile court and received probation with community service, which he completed. Elsa was informed by the juvenile court that De Luna's case was closed. Elsa stated that subsequently, De Luna was arrested for "PI," and was told that the bail was $168.00. Once Elsa obtained the money, she was told that De Luna owed $10,000 in tickets due to his truancy. Elsa believed that De Luna had already served his probation on those tickets, so she went to speak with appellant. Elsa stated that she spoke with a man at appellant's court who told her that she had to pay $10,000 for De Luna's release. However, Elsa did not have the money, so she asked if she could make payments. Elsa testified that she was told that she had to pay the entire amount before De Luna would be released from jail. Elsa stated that she informed the court that De Luna had already completed his probation for those truancy tickets. When asked to describe appellant's court's employees' attitude, Elsa said, "I believe it was very

33

unprofessional, because I did ask them to please, please—I pleaded with them to please let me make some kind of arrangement to get my son out. I mean, I was devastated. He had never been in jail, and as a mother you don't know what's going to go on or happen in there. And they didn't give me the opportunity." Elsa was told that her son would have to serve 101 days in jail for the fines.

## F. Juvenile Probation Officer, Juan Tijerina

Tijerina testified that he is assigned to "the court unit as a court officer" and is currently assigned to the 430th District Court. Tijerina described the juvenile court as "a court that has jurisdiction over juvenile cases, juveniles that commit crimes within the community and are arrested, those offenses that are committed are submitted to the probation department for review, and those are submitted to the District Attorney's Office to see if they will file a petition on those cases." When the prosecutor asked if juvenile cases are handled in the "JP court or a different court," Tijerina said, "No. They are handled in the—currently it's the 449th District Court that handles juvenile cases, the 430th District Court and the 332nd." Tijerina agreed with the prosecutor that cases can be transferred from the justice of the peace courts to the juvenile court. Tijerina explained that "what happens is that if an order to transfer is signed by a JP judge, it's submitted to the probation department's intake unit, and they assign the case accordingly." Tijerina stated that once a case is transferred to the juvenile court, it does not to his knowledge get transferred back to the justice of the peace court.

Tijerina agreed with the prosecutor that there were several different orders from appellant's court transferring De Luna's cases to juvenile court included in the court's documents admitted as State's Exhibits 9-5, 9-B, 9-S, 9-T, 9-U, 9-D, 9-C, 9-E, 9-F, 9-G,

9-H, 9-I, 9-J, 9-K, 9-L, 9-M, 9-O, 9-P, 9-Q, and 9-R. Tijerina stated that "[t]o [his] knowledge," if the justice of the peace court transfers a case to the juvenile court, the juvenile court "retains jurisdiction" and the justice of the peace court loses jurisdiction.

Tijerina stated that De Luna was ordered to serve one year of probation. Tijerina was not aware if De Luna successfully completed probation. However, Tijerina could tell from his file that Veronica Calvillo, the probation officer who was assigned to De Luna's case, "closed out the case."[30] Tijerina explained that if the child does not "successfully complete [probation], we [the probation officers] usually—it depends. If the child ages out of the—of the system, which is he turns 17 or 18, depending on the term of the probation, we can normally—if—if he—if he commits another offense, then we revoke the probation, but normally if—if everything seems to be well, then we just usually close the case out once he completes probation." Tijerina said that in the disposition letter, Calvillo documented that De Luna's probation term had expired. Tijerina explained that meant "that the 12-month period ended and usually if there wasn't any kind of subsequent offense, then the case was closed, successfully or not. It—it would depend on what that probation officer."

When asked what "does [double jeopardy] mean," Tijerina replied, "When somebody is charged with a crime the second time around once they've been found true or guilty of the offense." Tijerina agreed with the prosecutor that regarding all of De Luna's cases, "it would be fair to say that Francisco De Luna paid for those crimes." When asked, "And so if he was ordered to go to jail on those same crimes, that would be double jeopardy, would it not," Tijerina responded, "I would think so."

---

[30] Neither party requested admission of Tijerina's file.

35

On cross-examination, Tijerina testified that one of the charges De Luna had in the juvenile court concerned his running away from home and the other charge was for contempt of court. Tijerina clarified that "there was one set of contempts [sic] that were submitted [to the juvenile court], and then there were a second set of contempts [sic] that were submitted June 2007, and then there were another set of contempts [sic] that were submitted October the 4th of 2007." Tijerina stated that the juvenile court dealt with "[o]ne of the contempts [sic] [which] involved Mr. De Luna having tardies, another contempt involved Mr. De Luna having excessive tardies, and another contempt involved him having failure to attend school, another contempt for failure to attend school." Tijerina continued, "Another contempt for failure to attend school, subsequent failure to attend school, I believe the child having contraband or a weapon, another failure to attend school, a subsequent—this one involves failure to comply, [with] rules and penalties." Appellant's trial counsel stated, "Now, Mr. Tijerina, contempt is a separate offense from failure to attend school; is that right?" Tijerina replied, "To my understanding" and agreed that contempt and failure to attend school are different crimes. When asked what the State alleged in its petition in the juvenile court that De Luna had done, Tijerina stated that

> [the petition] included the runaway that occurred on August 20, 2007 and also included in Count Number 2 that Mr. De Luna failed to attend school on September—August the 22nd, 24th of 2006, September 1st, 25th, 20th, 2006; Count 3, failed to attend school October 11th, 7th, 24th, 30th, and 31st of 2006, also; Count 4, November 3rd, 10th, 16th, 29th, 2006; December 13th, 2006; Count 5 included January 8th, 10th, 11th, 17th, of 2007; and Count 6 included February the 5th, 15th, 2007, March 19th, 21st, 26th of 2007.

Tijerina testified that once the justice of the peace court transfers the cases to the juvenile court, the juvenile court alone maintains jurisdiction over those cases. Tijerina stated that

36

as a courtesy, someone from his department sometimes sends a disposition letter to the justice of the peace court indicating that the cases have been disposed. Tijerina testified that such a letter was included in his file regarding De Luna's cases, which was dated January 4, 2008.[31]

During re-direct examination, Tijerina testified that the probation department notified appellant of "the action that was taken in the juvenile court" regarding De Luna's probation. Tijerina stated that State's Exhibit 9X, a document entitled "Disposition" from the Hidalgo County Juvenile Center and signed by a juvenile probation officer, was sent to appellant's court as a courtesy and "a way to inform the referring agency of what action was taken in the case." When asked "what was the action taken in this case," Tijerina said, "In this particular one, I believe that the probation officer marked off—or wrote in, Family did not respond for services." Tijerina stated that the disposition letter did not transfer the cases back to appellant's court and that the form indicated that the case was not closed. However, Tijerina did not explain what the notation "[The] Family did not respond for services" meant. The trial court also admitted into evidence State's Exhibit 12, which is another "disposition letter" sent to appellant's court. State's Exhibit 12 documents that the juvenile court took action in De Luna's case and that he was "placed on Judicial Probation" on January 24, 2008 for "cont of court." Tijerina agreed with the prosecutor that based on the disposition letter, appellant should have "had knowledge"

---

[31] This January 4, 2008 disposition letter was not admitted into evidence, and there is nothing in the record showing that this letter was received by appellant's court. The record includes a disposition letter signed on July 13, 2007 by a probation officer regarding De Luna's case in the juvenile court. However, the offense listed is "Contempt of Court (11 cts)." A second disposition letter signed on January 8, 2008 is also included in the record. However, it lists the offense committed as "cont of court." No disposition letters regarding De Luna's multiple offenses committed at school for among other things, truancy, appear in the record.

that the juvenile court had placed De Luna on probation. However, Tijerina did not acknowledge that the probation was for contempt of court.

On re-cross examination, when appellant's defense attorney asked if De Luna pleaded guilty to contempt of court, Tijerina responded, "Correct." The disposition letter states that De Luna had been placed on "judicial probation" for the offense of contempt of court based on a referral received from appellant's court. It does not state that De Luna was punished for any other violations, which included the excessive absences and other Class C misdemeanor offenses. Although Tijerina referred to his file during his testimony, that file was not admitted into evidence.

### G.    Probation Intake Supervisor, Rafael Ocon

Ocon, a probation intake supervisor with the Hidalgo County Juvenile Probation Department, testified that he had reviewed the files from appellant's court in De Luna's case. Ocon observed that the file includes "orders to transfer, failure to attend" that indicated that appellant had transferred De Luna's cases on those Class C misdemeanor charges from her court to the juvenile court. Ocon stated that once appellant signed the transfer orders, "[s]he loses jurisdiction of those cases" and the juvenile court and the juvenile probation department "retain" jurisdiction. Ocon agreed with the prosecutor that appellant transferred all of De Luna's cases to the juvenile court and lost jurisdiction over the cases. According to Ocon, the judgment reflected that the probation department filed the cases against De Luna as "truancies."[32] Ocon explained that a truancy is the same

---

[32] This judgment is not in the record. Thus, although Ocon testified that it "reflected" that the probation department filed the cases against De Luna as "truancies," there is nothing in the record showing that the juvenile court disposed of those "truancies." Moreover, there were other charges against De Luna pending that were not "truancies," and Ocon did not testify as to what occurred in those cases against De Luna.

charge as a failure to attend school charge. Ocon testified that De Luna was placed on probation for a year, ordered to perform fifty hours of community service, and that De Luna completed those conditions. Ocon agreed that De Luna "completed the probation."[33]

## H.     Closing and the Verdict

The State rested, and defense counsel requested an instructed verdict on the basis that "there is no evidence at all or insufficient evidence as a matter of law from which the jury or any fact finder could find all of the elements beyond a reasonable doubt" because "[t]here is no evidence from any source" that appellant:  (1) 'intentionally with intent as defined by the—by this Penal Code subjected' the alleged victims to arrest"; or (2) "knew that any acts that she understood or she did were unlawful."  The State responded that the evidence showed "that each of the warrants that were signed on each of the individuals, warrants for their arrest" by appellant and that appellant "intentionally subjected each of those individuals to arrest by signing the warrants."  The prosecutor said, "When she signed those warrants, she intended—it was her conscious objective to arrest these particular individuals."  The prosecutor argued that "the law is imputed to [appellant] to know the law, and "[s]he signed 22 orders transferring [De Luna's cases]. She knew the law of transfer.  She lost jurisdiction in that case."  Finally, the prosecutor argued that appellant "knew by sending that [letter of continuing obligation to Trevino]— it's her position she should have never sent that letter out.  She still sent it out.  And she—

---

[33] As stated above, the only documents from the juvenile court are the disposition letters that show that the juvenile court had disposed of contempt of court charges against De Luna.  There is no evidence that the juvenile court ever disposed of the Class C misdemeanor charges against De Luna.  Thus, although Ocon testified that the judgment reflected that the probation department filed its case against De Luna as "truancies," there is nothing in the record showing that the juvenile court disposed of any truancy charges.

39

he came in on the designated time and place on that letter, and she still arrested him for failure to appear. That was clear. The arrest warrants and commitment letters all reflects failure to appear because it's through testimony that FTA stands for failure to appear." The trial court denied defense counsel's request for a directed verdict.

In closing argument, the State prosecutor stated, in pertinent part, the following:

I'm just going to read one of the counts to you, but basically says if you find from the evidence beyond a reasonable doubt that on or about—and then there is a different date for each victim in the—in the case—in Hidalgo County, Texas, had proof that these offenses happened in Hidalgo County, Texas, then Mary Alice Palacios, who we've had pointed out to you numerous times by most of the witnesses that came to testify, that she did intentionally subject each of the victims, [Trevino and De Luna] to an arrest—all she had to do was have them arrested—and that she knew her conduct was unlawful. Then you'll find—and that she was acting under the color of her title—color of her title of her public office, in other words, if she was acting as judge when she did these things, then you'll find her guilty.

One other thing I want to point out to you. Most of the charge is self-explanatory, but it is not required that the prosecution prove guilt beyond all possible doubt. All we have to do is prove to you beyond a reasonable doubt. . . .

Now, you want to look at the circumstances surrounding each of these arrests to try to determine the intent and the knowledge in each one of these cases.

Now, Mary Alice Palacios, Judge Palacios, has been a judge for quite a few years. We know that she's gone to training. The first year she was elected judge, she—now, these are required trainings. In addition to the required trainings, she can voluntarily go to more training, but she's required the first year to take 80 hours of training. Each year thereafter she has to take 20 hours of training. And—and throughout—which was done in each case.

Now, how would you know a person intended to do wrong? Okay. She signed a warrant on [Trevino's] case. He comes to court. He appears as directed by the judge. And he shows up in court. She signs a warrant, failure to appear. It's very obvious from all the testimony he did not fail to appear. She intentionally signed the warrant. She intentionally had him arrested. She knew he didn't fail to appear. He did appear. So she obviously intended her conduct, and she knew that conduct was wrong.

40

Now, when you look at these warrants—and I'll get a couple of them to show you. In State's Exhibits—in State's Exhibit 9-B—we'll take that one first. You'll have a warrant. But we also brought the sheriff's records, their warrants, copies of warrants, so you can compare if you care to. But it says, Violation: Failure to Attend School, FTA. Well, you could interpret that FTA to mean failure to attend school; however, you've heard a lot of testimony that FTA in parenthesis means failure to appear.

And I think one way that we can clear that up is if you'll take a look, especially in De Luna's cases, his warrant in 9-A is a different warrant. It says Violation, Failure to Comply with Directive. Then in parenthesis is FTA, Failure to Appear. So we know these arrests were for failure to appear.

Francisco—I mean [Trevino] clearly could not have been arrested for failure to appear when he appeared. I mean, that's obvious, very obvious. There is no two ways you can interpret that. If you don't appear, you've been summoned to appear, you don't appear, then you—then you can take a failure to appear warrant. And if you do appear, they can't take a failure to appear warrant. It's very, very obvious.

Now, secondly, we come to [De Luna]. He had numerous cases, many, many, many cases. And all these cases were transferred by the Court to the juvenile court.[34] And you've heard testimony. Go back and read this order of transfer. What does it say? It says, on the Court's own motion, we transfer [De Luna's] case to the juvenile court. Remember, she is the JP court. She moved these cases from her court to the juvenile court. She moved all of them to the court, all but one. She lost jurisdiction of those cases.

And she has attached to each one of these exhibits—I'm not going to go through each one with you. She has attached to these exhibits the order transferring the case. And if you will look through these exhibits, there is no order transferring the case back to the Court. She transferred this particular case I'm looking at on the 8th day of March of 2007.

The next thing she does is on December 17th of 2008. That's a year and about three-quarters, a year and eight or nine months later. A year and eight or nine months later, she sends out what they refer to as the birthday letter or the notice of continuing obligation on all these cases. You count these, these JP numbers up here, one, two, three, four, five, [and] six. It comes up to, like, 22 or 23 cases that she transferred—I mean that she is

_____

[34] The State concedes that appellant had not transferred one of De Luna's cases before she issued an arrest warrant.

41

noticing him to appear in court on; however, when you look at the file, there is no order transferring these cases back, none whatsoever. It's very obvious she did not have jurisdiction in this case.

Yet she also gets a letter from the probation department, which I'd like to remind you of. She got a letter from the probation department telling her, in all these cases you've transferred to our court, we have put [De Luna] on probation.[35] She had notice of that.

But in spite of all that, he took out all his warrants for failure to appear. And then if you'll look at these warrants carefully, it's a command to any peace officer that if they come across [De Luna] to arrest him. So when [De Luna] was arrested for a public intoxication charge, the sheriff's office had all these warrants on file, so they arrested him for all these.[36] Clearly wrong, clearly wrong. Anybody would know it's wrong.

It's double jeopardy. That's a very basic fundamental right that we all have. Everybody knows about double jeopardy. It's not something that you would make a mistake on. You know it's wrong. You can't punish a person twice. You can't try a person twice for the same offense. If you have a murderer—if we try a murderer, as a prosecutor, if I lose that case, it's over. We don't get another shot at him. It's over. If we try him for murder and we don't like the punishment, whatever he gets, it's over. We can't go back and assess some more punishment. It's over. We can only punish him once for the offense. It's a very basic, very fundamental right that was violated by this Judge.[37]

---

[35] The letter does not state that De Luna was placed on probation in all of the cases that appellant transferred to the juvenile court. The form letter filled in by a juvenile probation officer has one cause number which is J-07702. The only offense listed is contempt of court. We have reviewed all of the charges that were transferred to the juvenile court by appellant. De Luna was not accused of contempt of court in any of those transferred cases. The State presented no evidence linking the contempt of court charge with those transferred cases. *See* TEX. CODE OF CRIM. PROC. ANN. art. 45.050 (West, Westlaw through 2013 3d C.S.) (establishing that a justice court may, among other things, "refer the child to the appropriate juvenile court for delinquent conduct [or] for contempt of the justice or municipal court order" if that child has failed "to obey an order of a justice or municipal court under circumstances that would constitute contempt of court"). Without an explanation of the procedures that are followed and how and when a justice court loses jurisdiction, it is very difficult to determine whether appellant's court had jurisdiction in this case.

[36] As explained further below, the State presented no evidence that the sheriff's office arrested De Luna again after he was arrested for either public intoxication or possession of marihuana.

[37] In her brief, appellant argues that one of the State's theories was that she lost jurisdiction over Trevino's cases by the time she issued the warrants for his arrest. However, after reviewing the State's opening and closing argument and the evidence, we disagree that the State offered this theory as to Trevino to the jury.

The jury convicted appellant of official oppression of Trevino and De Luna. Appellant filed a motion for new trial, and after a hearing, the trial court denied the motion. This appeal followed.

## IV.  DISCUSSION

As previously held, a judge is not subject to criminal liability when it is proven that the court she presides over does not have jurisdiction or if that judge commits a double jeopardy violation.  Nonetheless, as explained below, we have also determined that the evidence is insufficient to support any of the State's theories.

Specifically, appellant, by her first, second, and third issues, argues that the evidence was insufficient to show that she knew that her acts were unlawful and that the State did not provide any evidence that she was not justified when she signed the complained-of warrants.  The State claims that the fact finder in this case could have inferred from the evidence that appellant knew that her court lacked the requisite jurisdiction in De Luna's case and that in Trevino's case, even a lay person knows that one cannot arrest a person for failure to appear when the person did in fact appear.

We agree with appellant.  All of the alleged acts involve appellant's discharge of official duties and her judicial interpretation of the applicable law.  If appellant signed the warrant for Trevino's arrest for a crime he did not commit, the State was still required to prove that appellant intended to subject Trevino to an arrest that she knew was unlawful.[38]

### A.    Trevino

---

[38] Although, the State alluded to a civil lawsuit against appellant, it did not provide any evidence that appellant committed a tort when she issued the complained-of warrants.  Moreover, the State did not allege at trial and has not alleged on appeal that appellant committed any torts when she signed the warrants.

43

In our sufficiency review, we must review all of the evidence presented in order to determine whether the jury's finding of guilt is a rational finding. *See Brooks*, 323 S.W.3d at 907 (explaining that although a jury may believe one witness and disregard some of the evidence, "based on *all* the evidence" the jury's finding of guilt must be rational). Therefore, we will set out all of the evidence below and explain how that evidence is insufficient under the State's theories.

1.   The "FTA" Notation

At appellant's trial, the State relied on evidence that Trevino's arrest warrants had the notation "FTA."  The State argued this meant that Trevino was arrested for failure to appear, and it was undisputed that Trevino always appeared in appellant's court when summoned.

The evidence presented at trial showed that Trevino owed court imposed fines in two cases for failure to attend school.  The evidence shows that when Trevino appeared in appellant's courtroom on the day that appellant signed the arrest warrant (August 4, 2009), he signed a waiver indicating that he would serve a sentence in jail in lieu of paying the fines that he had been ordered to pay for two counts of failure to attend school.[39]

---

[39] Although not presented to the jury, article 45.046 of the Texas Code of Criminal Procedure states the following:

(a)   When a judgment and sentence have been entered against a defendant and the defendant defaults in the discharge of the judgment, the judge may order the defendant confined in jail until discharged by law if the judge at a hearing makes a written determination that:

(1)   the defendant is not indigent and has failed to make a good faith effort to discharge the fine and costs; or

(2)   the defendant is indigent and:

(A)   has failed to make a good faith effort to discharge the fines and costs under Article 45.049; and

(B)   could have discharged the fines and costs under

44

The docket sheets from appellant's court show that appellant ordered Trevino to pay fines in two causes by August 4, 2009.[40] In addition, Trevino acknowledged that appellant had ordered him to pay fines and that he had not done so. Trevino testified that he believed he owed about $1,000.00 in fines. Trevino also agreed that, although appellant had offered to give him more time to pay the fines, he refused her offer. The State presented no evidence that Trevino did not owe the fines and court costs or that appellant committed any improper acts in allowing Trevino to waive payment of his fines and go to jail. Moreover, when the prosecutor asked why he was arrested, Trevino replied, "Because I hadn't finished paying off my fines."[41] Trevino explained that he chose to go to jail instead of paying his fines or his mother doing community service "[b]ecause it was my behalf, you know what I mean? It was my mistake so I was going to have it." Trevino never stated that he had been arrested for failing to appear in appellant's court.

State's Exhibit 7A and 7B include a "Waiver of Alternative Sentencing and Request for Incarceration in Satisfaction of Fine and Costs" signed by Trevino on August 4, 2009 under two separate cause numbers in appellant's court. Each waiver states:

> The Court has explained to me my right to be released to pay the fine(s) and court costs at some later date in the manner prescribed in Art. 45.041, C.A.C.C.P.[42] I understand that I have such a right and I do hereby

---

Article 45.049 without experiencing any undue hardship.

TEX. CODE CRIM. PROC. art. 45.046 (West, Westlaw through 2013 3d C.S.).

[40] The record also contains an order showing that appellant conducted a hearing before she ordered Trevino to pay the fines.

[41] Trevino stated that appellant's court's secretary told him that "there were $500 that were missing." Trevino said, "I remember specifically because my dad was asking for 200. Only 3 and I told him that was too much money just to get me in there so I'd take the time instead." The prosecutor asked, "And how much total did you owe?" Trevino responded, "I think it was around—I think maybe 1,000 and a half, like almost 2,000."

[42] Article 45.041 states, in relevant part, the following:

expressly waive this right in the above-styled case and request that I be imprisoned in jail for a sufficient length of time to discharge the full amount of fine(s) and costs adjudge [sic] against me as provided by Art. 45.048.[43]

Each warrant issued by appellant states:

---

Judgment

(a)  The judgment and sentence, in case of conviction in a criminal action before a justice of the peace or municipal court judge, shall be that the defendant pay the amount of the fine and costs to the state.

(b)  Subject to Subsection (b–2), the justice or judge may direct the defendant:

  (1)  to pay:

    (A)  the entire fine and costs when sentence is pronounced;

    (B)  the entire fine and costs at some later date; or

    (C)  a specified portion of the fine and costs at designated intervals;

    . . . .

(b-2)  When imposing a fine and costs, if the justice or judge determines that the defendant is unable to immediately pay the fine and costs, the justice or judge shall allow the defendant to pay the fine and costs in specified portions at designated intervals.

(c)  The justice or judge shall credit the defendant for time served in jail as provided by Article 42.03. The credit shall be applied to the amount of the fine and costs at the rate provided by Article 45.048.

TEX. CODE CRIM. PROC. ANN. art. 45.041 (West, Westlaw through 2013 3d C.S.).

[43] Article 45.048 states:

Discharged from Jail[]

(a)  A defendant placed in jail on account of failure to pay the fine and costs shall be discharged on habeas corpus by showing that the defendant:

  (1)  is too poor to pay the fine and costs; or

  (2)  has remained in jail a sufficient length of time to satisfy the fine and costs, at the rate of not less than $ 50 for each period of time served, as specified by the convicting court in the judgment in the case.

(b)  A convicting court may specify a period of time that is not less than eight hours or more than 24 hours as the period for which a defendant who fails to pay the fines and costs in the case must remain in jail to satisfy $ 50 of the fine and costs.

*Id.* art. 45.048 (West, Westlaw through 2013 3d C.S.).  The jury was not provided with copies of articles 45.041 and 45.048.

To any Peace Officer of the State of Texas, Greeting: You are hereby Commanded to arrest Trevino, Lee Roy if be found in your County and bring Him/Her before me, a Justice of the Peace in and for Precinct No. 4, Place 2, of Hidalgo County, Texas at my office at 222 N. 12th Ave., Tx., in said County Immediately, then and there to answer the State of Texas for an offense against the laws of said State, to-wit: . . . . Fine $537 . . . Name of Complainant: JJAEP- . . . Herein Fail not, but of this writ make due return, showing how You have executed the same. Violation: 1. Failure to Attend School (FTA).

Each commitment order states:

The State of Texas, to the Sheriff or any Constable of Hidalgo County, Greeting: . . . YOU ARE HEREBY COMMANDED to commit to the jail of Hidalgo County, Texas the body of [Trevino] . . . Who has been convicted in this court of the offense of Fail to Attend School (FTA) . . . .

The said defendant to be released upon remaining in custody for the time required by law to satisfy the amount of such fine and cost, or upon such fine and costs being remitted by the proper authority, or upon the full payment of fine and cost, the amount of which is now due is $537.

The warrants set out that appellant ordered the arrest of Trevino "for an offense against the laws of said State, to wit" a "Fine $537" and that the complainant was the "JJAEP" for the violation of "Failure to Attend School (FTA)."[44] The violation noted on the warrant is for "Failure to Attend School (FTA)" on the basis of a complaint filed by Trevino's school, "JJAEP." The failure to attend school complaint was filed on March 7, 2008, and the offense date documented on the warrant was March 7, 2008. [45] Thus, the warrant clearly documents that Trevino's offense occurred on March 7, 2008 and was based on a

---

[44] "JJAEP" is the alternative school that Trevino attended.

[45] If Trevino had been arrested for failure to appear, the warrant should have listed the date of the offense for that charge and the complainant would have been appellant's court. Moreover, the date on the warrant would not have been March 7, 2008, and the complainant would not have been Trevino's school.

47

complaint filed in appellant's court by his school.[46]  The warrant does not state that appellant's court is the complainant.[47]

In summary, Trevino signed the waiver on August 4, 2009, and appellant signed the arrest warrants and commitment orders on August 4, 2009.  The waivers state that appellant had explained to Trevino that he had a right to be released to pay the fines and court costs at some later date in the manner prescribed in article 45.041.[48]  Thus, because Trevino signed the waiver to spend time in jail in lieu of paying the fines, no rational jury could have inferred that the "FTA" notation on the arrest warrants proved beyond a reasonable doubt that appellant issued the warrants to arrest Trevino for failure to appear. Accordingly, there is no evidence that appellant knew that arresting Trevino was "unlawful" for the reasons claimed by the State.

The commitment orders signed by appellant committing Trevino to the jail were filed in the Hidalgo County Sheriff's Office ("HCSO") by the custodian of records.  In those commitment orders, the "Officer's Return" has been completed and documents that the commitment orders were executed on August 4, 2009 at 12:00 p.m.  However, the HCSO File does not contain any arrest warrants for Trevino.  Thus, there is nothing in the record showing that the arrest warrants with the "FTA" notation were actually served on Trevino. Trevino was placed in confinement on August 4, 2009, thus, at some point perhaps he

---

[46] The record contains copies of the complaints filed in appellant's court by Trevino's school.

[47] Therefore, we interpret the warrants as documenting that appellant ordered Trevino's arrest because he had not paid the fines for two separate failure-to-attend-school offenses.  We emphasize that we respectfully disagree with the State's interpretation of the warrants.

[48] The deferred adjudication judgment signed by appellant in one of Trevino's cases, states that Trevino was charged with the offense of "FTA School" committed on March 7, 2008.  It defies logic to suggest that appellant meant that Trevino was charged with the offense of "failure to appear in court school."

was arrested. However, the evidence undisputedly shows that if Trevino was in fact arrested, he was arrested after signing the waivers. And there is no evidence in the record that the HCSO ever executed the warrants with the erroneous "FTA" notation. *See id.* art. 15.22 (West, Westlaw through 3d C.S.) ("A person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without a warrant."). Although we cannot discern from the record under which authority Trevino may have been arrested, it was the State's burden to prove beyond a reasonable doubt that Trevino's arrest was unlawful due to these allegedly erroneous warrants. Finally, the docket sheets from appellant's court in Trevino's cases state that on August 4, 2009, Trevino's cases were closed due to "Time served." If Trevino had in fact been arrested for failure to appear, Trevino's unpaid fines would have still been pending in appellant's court, and Trevino's cases would not have been closed.

Here, viewing the evidence in the light most favorable to the jury's verdict, we conclude that based on all of the evidence presented, no rational juror could have found beyond a reasonable doubt that appellant ordered Trevino's arrest for failure to appear. Moreover, because Trevino signed the waiver, the evidence presented in this case does not support a finding that appellant's act in signing the arrest warrant with the "FTA" notation was in any way unlawful.

2.      Article 45.060

The State also attempted to invoke article 45.060 as proving that appellant was precluded from having Trevino arrested for offenses he committed before the age of seventeen. Article 45.060 is entitled, "Unadjudicated Children, Now Adults; Notice on

49

Reaching Age of Majority; Offense," and it states, in relevant part, "Except as provided by Articles 45.058 and 45.059, an individual may not be taken into secured custody for offenses alleged to have occurred before the individual's 17th birthday." However, the State did not provide any evidence regarding the meaning of the term "secured custody." And, it is well established that individuals under the age of seventeen can be arrested under certain circumstances. *See Lanes v. State*, 767 S.W.2d 789 (Tex. Crim. App. 1989) (establishing that a juvenile may be arrested if probable cause exists). Because there is no evidence regarding the meaning of "secured custody" as used in article 45.060, no rational jury could have found beyond a reasonable doubt that article 45.060 prohibits the arrest of an individual for offenses committed before the age of seventeen. Moreover, article 45.045 allows a justice of the peace to issue a capias pro fine for person who committed an offense before the age of seventeen if the individual is seventeen years of age or older, and "the court finds that the issuance of the capias pro fine is justified after considering" (1) "the sophistication and maturity of the individual;" (2) "the criminal record and history of the individual;" and (3) "the reasonable likelihood of bringing about the discharge of the judgment through the use of procedures and services currently available to the court;" and "the court has proceeded under Article 45.050 to compel the individual to discharge the judgment."[49] TEX. CODE CRIM. PROC. art. 45.045. Article 45.045 further states, that "(a) If the defendant is not in custody when the judgment is rendered *or if the defendant fails to satisfy the judgment according to its terms*, the court may order a capias pro fine issued for the defendant's arrest." *Id.* (Emphasis added).

---

[49] The State provided no evidence that appellant did not comply with article 45.045 when she issued the pro capias fine for Trevino.

50

Nonetheless, even assuming without deciding, that the State showed that pursuant to article 45.060, appellant's placing Trevino in "secured custody" for his failure to pay the fines and court costs was improper, the State did not provide any evidence that appellant's act was criminal, tortious, or both. At best, the State showed that appellant misinterpreted the applicable law. The State cites no authority, and we find none, providing that a judge's misinterpretation of a statute amounts to a crime or tort. Therefore, the State failed to prove that appellant's act, even if true, was unlawful. *See* TEX. PENAL CODE ANN. § 1.07(a)(48) (defining unlawful as criminal or tortious without a justification or privilege).

### 3. Knowledge and Justification

Finally, the evidence fails to support a finding that appellant did not reasonably believe that her conduct was required or authorized by law when she signed the warrants for Trevino's arrest. *See* TEX. PENAL CODE ANN. § 9.21(a). The "FTA" notation is no more than a mere modicum of evidence, and as previously stated, no rational jury could have reasonably inferred that the "FTA" notation proved beyond a reasonable doubt that appellant had Trevino arrested for failing to appear in her court.[50] Instead, the evidence

---

[50] As Judge Cochran's concurring opinion in *Brooks* emphasized, the mere existence of some evidence is not sufficient in criminal cases—there must be sufficient evidence for a rational juror to reach a conclusion beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). Legal sufficiency is judged not by the quantity of evidence, but by the quality of the evidence and the level of certainty it engenders in the fact finder's mind. *Id.* at 918. In *Brooks*, the Texas Court of Criminal Appeals provided the following analogy:

> The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on all the evidence the jury's finding of guilt is not a rational finding.

*Brooks*, 323 S.W.3d at 907 (quoting *Johnson v. State*, 23 S.W.3d 1, 15 (Tex. Crim. App. 2000) (McCormick, P.J., dissenting)).

As the example in *Brooks* shows, the jury in this case was free to disregard the undisputed evidence that appellant had Trevino arrested because he signed a waiver in lieu of paying the fines he agreed to pay.

51

undisputedly shows that Trevino signed a waiver and chose to serve a jail sentence in lieu of paying his fines.[51] Thus, the evidence does not support a conclusion that appellant knew that she lacked authority to sign the arrest warrants for Trevino, despite any documentation or testimony that he was arrested for "failure to appear."[52] Accordingly, we conclude that the evidence was insufficient to prove beyond a reasonable doubt that appellant committed the offense of official oppression under these facts.

### C.    De Luna

Regarding De Luna, the State claimed that appellant's court lacked jurisdiction to issue the warrants for De Luna's arrest and that she allegedly violated double jeopardy principles by punishing De Luna for crimes that he had already been punished for committing by the juvenile court. The State's theory was that once appellant transferred De Luna's cases to the juvenile court, her court lost jurisdiction to perform any acts in De Luna's cases. And once De Luna served his sentence in the juvenile court, he had already been punished for the offenses that appellant had transferred.

In order to convict appellant under the State's theory, the jury had to determine whether appellant's court had jurisdiction over De Luna's cases and whether De Luna

---

However, the jury was not free to infer from the "FTA" notation alone that appellant knew that Trevino always appeared in her court but had him arrested for failure to appear anyway because Trevino admitted that he was arrested pursuant to his signed waiver. *See id.*

[51] The State did not present any evidence that appellant was not authorized to allow Trevino to sign the waiver and chose to serve a jail sentence instead of paying his fines. In addition, under articles 45.046, 45.045, and 45.048 state otherwise.

[52] We note that if appellant believed that Trevino had failed to appear in her court, the evidence still had to establish that she knew that her acts were "unlawful." Although such a mistake cannot be condoned, and we disapprove of such error, mistakes are nonetheless made by trial judges in criminal matters, and we cannot conclude that such mistakes amount to criminal or tortious behavior. Under this record, no evidence was presented that appellant knew that Trevino always appeared in her court and that despite this knowledge, she still had him arrested for failure to appear. In addition, as previously stated, we respectfully disagree with the State's contention that appellant had Trevino arrested for failure to appear.

52

had already been punished by the juvenile court for the offenses that he was allegedly arrested for committing.[53] The State cites no authority, and we find none, which allows a fact finder to determine whether a trial court lacked jurisdiction to perform a certain act or to determine whether a judge's order violates double jeopardy.[54] The usual procedure in these matters is for the defendant to appeal the case to a higher court or to seek relief by filing a writ of habeas corpus.[55]

By presenting the issue of whether appellant's court lacked jurisdiction to the jury, the trial court judge in appellant's case agreed that jurisdiction may be determined from the testimony of lay witnesses as a factual issue. We find no authority, and the State cites none, supporting a conclusion that the issue of whether a court has jurisdiction can be determined by lay witness testimony or that a fact finder may determine jurisdiction by either believing or disbelieving the witnesses. Instead, whether a court has jurisdiction is determined as a matter of law. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226, 228 (Tex. 2004) (determining whether a court has subject matter jurisdiction is question of law that is reviewed de novo by an appellate court); *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002); *Robinson v. Neeley*, 192 S.W.3d 904, 907 (Tex. App.—Dallas 2006, no pet.). To determine as a matter of law

---

[53] A defendant is subjected to double jeopardy when he receives multiple punishments for the same offense. *Cervantes v. State*, 815 S.W.2d 569, 572 (Tex. Crim. App. 1991) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).

[54] Even a Justice of the United States Supreme Court opined that the Supreme Court's cases "in this area indicate, [that] the meaning of the Double Jeopardy Clause is not always readily apparent." *Tibbs v. Fla.*, 457 U.S. 31, 47 (U.S. 1982) (J. White, dissent).

[55] We note that the jury was never informed that appellate courts have reversed trial courts on the basis that the arrest of the defendant was invalid because the warrants issued were improper and on the basis that the trial court's conviction violated the prohibition of double jeopardy. *See Littrell v. State*, 271 S.W.3d 273, 275 (Tex. Crim. App. 2008) (holding that appellant was subjected to double jeopardy and reversing court of appeals decision finding that there was no double jeopardy violation).

53

whether a court has jurisdiction, we review the Texas Constitution or applicable statutes granting the court its jurisdiction. *See Gallagher v. State*, 690 S.W.2d 587, 593 (Tex. Crim. App. 1985) ("Where jurisdiction is given by the Constitution over cases involving designated kinds of subject matters, the grant is exclusive, unless a contrary intent is shown by the context. Further, it has been stated that the jurisdiction of the district court is fixed by the state Constitution and is immutable except by constitutional method of amendment"); *Simpson v. State*, 137 S.W.2d 1035, 1037 (1940) (determining whether a district court lacked jurisdiction to try a police officer for official misconduct by construing the Texas Constitution); *Hall v. State*, 736 S.W.2d 818 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd) (analyzing jurisdiction of a district court by reviewing the articles of the Texas Code of Criminal Procedure); *State v. Hall*, 829 S.W.2d 184, 188 (Tex. Crim. App. 1992) (reviewing whether the lower court lacked jurisdiction by analyzing both the Texas Code of Criminal Procedure and the Texas Constitution).

In this case, the State failed to present to the jury the statute conferring jurisdiction to the justice courts or the statute conferring jurisdiction to the juvenile courts. The State made no effort to show that as a matter of law, appellant's court lacked jurisdiction when she issued the complained-of warrants to arrest De Luna. The State further failed to recognize that appellant's acts were done in the administration of her court's docket and that, as the judge, appellant had a duty to make those administrative decisions and to interpret the law. Instead, the State presented testimony from lay witnesses who stated that it was their understanding and belief that once appellant transferred the cases to the juvenile court, the justice court lost jurisdiction completely. We have reviewed the records from appellant's court and the disposition letters sent by the juvenile court. The

documents signed by appellant transferring the cases to the juvenile court do not mention any contempt-of-court charges against De Luna. However, it is undisputed and the evidence shows that the juvenile court disposed of several contempt of court charges filed by appellant's court against De Luna and that De Luna served probation on those charges.

The evidence the State presented regarding De Luna's case was not clearly explained. For example, the State presented no evidence regarding what punishment, if any, De Luna received in the Class C misdemeanor charges. Also, there is no evidence that the juvenile court disposed of the twenty-two Class C misdemeanor charges or that the State dismissed those charges. The State also failed to provide any law on this issue. Thus, the State did not fully explain the procedure a justice court follows when the juvenile court does not dispose of class C misdemeanor offenses that have initially been transferred to the justice court but not disposed of by that court. It appears that more information was necessary to determine whether appellant's court lost jurisdiction over all of De Luna's cases. Moreover, the State did not offer into evidence the entire file from the juvenile court regarding De Luna's cases. Finally, appellant did not transfer one of De Luna's cases to the juvenile court, and the State failed to explain the impact of that decision. It was the State's burden to show that appellant's acts were unlawful, and it insisted on proving that her court's alleged lack of jurisdiction made her acts unlawful. Therefore, the State had the burden of providing the necessary information to the jury.

Also, there are questions regarding a "disposition letter" sent by the probation department to appellant's court stating that the "family had refused services" in one of the cases she transferred to the juvenile court. The State presented no evidence regarding

how a family can refuse services when a child has been accused of a misdemeanor offense. When asked, Cherry, a former case manager in appellant's court, stated that the letter "would be something we would get back from juvenile probation as to whether or not they were going to pursue the matter or not." Cherry then testified that her interpretation of this letter was that the juvenile court did not have jurisdiction over that particular case. Thus, although a probation officer testified that the disposition letter did not transfer jurisdiction back to appellant's court, a legal conclusion that the officer was not qualified to make or for which the jury was not entitled to pass judgment upon, the only evidence before the jury shows that appellant's court personnel believed that the letter did in fact transfer jurisdiction back to her court. Thus, even if the State proved that Cherry was mistaken, the State did not prove that appellant knew that Cherry was mistaken. In other words, the evidence before the jury only supports a finding that appellant did not interpret the disposition letter in the same way that the probation officer interpreted it. Therefore, the evidence does not support a finding that appellant knew that her court lacked jurisdiction and that her acts were as the State alleged "unlawful."

The difficulty in determining the legal sufficiency of the evidence under our standard of review is readily apparent because the offenses, as alleged by the State turn on a determination of questions of law.[56] This includes a determination of whether a defendant's double jeopardy rights have been violated. Nonetheless, we will address the sufficiency of the evidence to the extent that we find that it is possible.

The evidence presented showed that De Luna had twenty-two Class C misdemeanor charges pending in appellant's court. De Luna committed those offenses

---

[56] We do not usually apply sufficiency of the evidence review when determining questions of law.

at school.  The record contains multiple transfer orders signed by appellant, transferring De Luna's cases to the juvenile court.  The evidence further showed that appellant did not transfer one of De Luna's cases to the juvenile court.  However, the evidence presented undisputedly shows that the juvenile court placed De Luna on probation only for contempt-of-court offenses.  There is nothing in the record showing that the juvenile court made any ruling on the Class C misdemeanor cases or otherwise disposed of them.

Next, it was undisputed at trial that De Luna was not initially arrested pursuant to the warrants issued by appellant and that he was instead arrested for either public intoxication or possession of marihuana.  In fact, the State conceded at trial that De Luna was originally arrested for public intoxication.  The prosecutor stated in closing argument the following:  "So when [De Luna] was arrested for a public intoxication charge, the sheriff's office had all these warrants on file, so they arrested him for all these.  Clearly wrong, clearly wrong.  Anybody would know it's wrong."[57]  It was further undisputed that the reason that De Luna was not released from jail when his mother went to post his bail after he was arrested for public intoxication was due to De Luna's failure to pay the fines he had not paid in appellant's court.[58]  However, there is no evidence in the record that if appellant's court had jurisdiction, she was not allowed to issue the capias pro fine warrants for De Luna's arrest.[59]  The entirety of the State's case rests on whether

---

[57] We note that the State presented no evidence of the proper procedures that occur in a case where a person is arrested and then it is discovered that the person has warrants for his arrest.  First of all, it is unknown what agency arrested De Luna for the public intoxication charge.  Also, as further explained below, there was no evidence presented that the Sheriff's Office ever executed these warrants.

[58] The commitment orders do not appear in the record.  However, at appellant's motion for new trial hearing, defense counsel stated that the Honorable Rosa Trevino signed the commitment orders in De Luna's case.

[59] Again, articles 45.045 and 45.050 allow capias pro fines to be issued for a person's arrest for an offense he or she committed before the age of seventeen under certain circumstances already explained.  There is no evidence that appellant failed to comply with those articles when she issued the capias pro fine

57

appellant subjected De Luna to an unlawful arrest because her court lacked jurisdiction and she somehow violated his right against double jeopardy.

At trial and on appeal, the State relies on the theory of constructive arrest wherein the State argues once a person has been arrested for an offense, if a separate arrest warrant has been issued for that person, the person is then re-arrested on the warrants. At trial, although the State made this argument, it did not provide any evidence to the jury regarding the theory of constructive arrest.

However, in its brief, the State claims that De Luna's mother "indicated that [De Luna] had been arrested for failure to appear in January of 2010." The State supports its claim with the following colloquy between the prosecutor and De Luna's mother:

[Prosecutor]: Okay. Now, do you recall when your son was arrested on these [sic] failure to appear warrants or these truancy warrants?

A: It was back in January of last year.

[Prosecutor]: Okay. And did you inquire into how much he owed and how long he was going to have to spend in jail?

A: When I called, they told me that he was arrested for PI, and his—his bail was $168, so I said, Okay, I'll be there shortly and take your—you this money so we can bail him out, but I was having problems obtaining that money, because at that time I was not employed.

And so later on I got the money together and called back and told them, Okay, I got the money, I'm going to go to the bail bondsman and have him bailed out, but they told me that he owed $10,000 in tickets.

And I'm like, What? I'm like, From what? They said, From truancy. I'm like, But he already went to court for that. How can he be charged again? He already went to court for that. And they said, No ma'am, this has to do with the county. That

---

warrants for De Luna's arrest.

58

was the State. And I'm like, But it's the same charge, so how are you charging me again? They said, Well, you go and speak to [appellant's] office, which I did the next day.

And then I spoke to some gentleman there, and I told him, How are you charging—I want to know what all these charges are about. Oh, well, these tickets have to do back when he was in seventh grade. And I go, It's taken you this long to notify me that he owes all this? And he said, The only way that he can get out is if you pay the amount of $10,000. I go, But I don't have that amount. Can I make some kind of arrangements to pay? I have $300 right now, and I can pay $300 a month. And they said, No, they wanted the whole amount, $10,000. I had—I didn't have that money.

On cross-examination, De Luna's mother agreed that De Luna was arrested for public intoxication. We disagree with the State's characterization of De Luna's mother's testimony. When read in context, De Luna's mother testified that De Luna was arrested for public intoxication. Although she agreed with the prosecutor's leading question asking when De Luna was arrested for "failure to appear," she then clarified that he was actually arrested for public intoxication. In addition, De Luna's mother explained that De Luna was not released from custody due to $10,000 worth of tickets.

Next, the State asked, "And then [after his possession of marihuana charge was disposed of,] he [De Luna] was arrested on those offenses [the offenses for which appellant issued the warrants]?" Gonzalez, the Chief Public Defender, replied, "He was arrested for possession of marijuana, Class B misdemeanor, and he disposed of the case and he is continued [sic] to remain in custody on the offenses listed in Exhibit 2 [(the offenses for which appellant issued the warrants])." Also, when the prosecutor attempted to elicit testimony from him that De Luna was arrested for "failure to appear," Gonzalez did not agree and stated that the Able Term system documented that De Luna was arrested for possession of marihuana, and held in jail due to the warrants signed by

59

appellant. Again, the State did not allege that appellant subjected De Luna to unlawful continued confinement.

We acknowledge that Gonzalez agreed with the prosecutor when asked, that "in order for [De Luna] to have been in custody on those offenses, [De Luna] had to have been originally arrested for those" and responded "yes" when the prosecutor asked, "And in order for [De Luna] to have been in custody on those offenses, he had to have been originally arrested for those?" And Gonzalez "believed" that De Luna was arrested for those offenses. However, when asked by the State where the warrants issued by appellant were served, Gonzalez replied, "That, I don't know. Exactly I don't know where they were served." Moreover, Gonzalez admitted that in De Luna's case, he only conducted a "cursory review of the law", that he "wasn't confident" of his interpretation of the Juvenile Code, he sought advice from an employee of the district attorney's office, Schreiber, on the issue, and that he did not review De Luna's files from appellant's court or "do any kind of investigation." Gonzalez further testified that Schreiber "didn't understand what [Gonzalez] was saying" and informed Gonzalez that this area of the law is in his opinion "a gray area." The evidence must support a rational finding, and we cannot conclude that a rational juror could have concluded beyond a reasonable doubt that De Luna was arrested again pursuant to the warrants on the basis of Gonzalez's "belief." Instead, the undisputed evidence shows that those warrants were never served.

In its brief, the State also cites portions of testimony of appellant's court coordinator, Leal, for support that De Luna was arrested pursuant to the warrants signed by appellant. However, the portion of the record cited by the State is in the form of a voir dire conducted by the prosecutor during defense counsel's direct examination of Leal.

60

Defense counsel attempted to elicit testimony from Leal regarding the judges who arraigned Trevino and De Luna. However, the State objected on the basis of hearsay. The trial court allowed the prosecutor to take Leal on voir dire. During the voir dire, the prosecutor asked, "And the arraignment at the County Jail, those—that's after [Trevino and De Luna] having been arrested on the warrants issued by Judge Mary Alice Palacios; is that correct," Leal replied, "Yes, ma'am." After the prosecutor completed the voir dire of Leal, the trial court sustained the State's objection to Leal's testimony regarding who arraigned De Luna and Trevino. The trial court allowed the above cited questions for the purpose of determining whether Leal's testimony was based on hearsay, and it sustained the State's hearsay objection. Therefore, we will not consider the prosecutor's voir dire of Leal as admitted evidence.

Also, the documentary evidence shows that the warrants signed by appellant for De Luna's arrest were not actually executed. Thus, the evidence in the record contradicts Gonzalez's testimony that he believed De Luna was arrested pursuant to the warrants signed by appellant. Each docket sheet from appellant's court in De Luna's cases states that on January 11, 2010, the "warrant[s] [were] recalled/Pending jail rpt fm HCSO." No one explained what was meant when appellant documented that the warrants had been recalled.

The State asked Leal, "So, essentially, that was—you are aware that Francisco De Luna was arrested and jailed and then you recall the warrant on this particular case," Leal replied, "Yes. It was recalled at the Sheriff's Office when he was served with it." However, when Leal made this statement, he was reviewing the one case that appellant did not transfer to the juvenile court. Thus, the State could not argue that appellant lacked

61

jurisdiction to issue the warrant in that case. The State did not ask Leal to review any of the other warrants pertaining to De Luna. Therefore, there is no evidence that, in general, the notation "warrant recalled/pending jail report fm HCSO" meant that the warrant had been officially served. Leal simply stated that he remembered that in that particular case, the warrant had been served. Moreover, all of the warrants for De Luna's arrest filed by the HCSO's custodian of records have blank Officer's Return sections. In contrast, the Officer's Return in the commitment orders in Trevino's case filed by the HCSO's custodian of records is completed and documents that it was executed on August 4, 2009 at twelve o'clock p.m. The Officer's Return on the warrant for Diaz's arrest is also completed and documents that it was executed on February 25, 2010 at 1:37 p.m.[60]

Nonetheless, even assuming without deciding that the arrest warrants had been served on De Luna and that he was in fact arrested pursuant to those warrants, there is no evidence that appellant knew her acts were improper in any way or that she was not justified when she issued those warrants as further explained below. The State alleged that appellant transferred all of De Luna's cases to the juvenile court. However, the "Docket Sheets" from appellant's court in De Luna's cases show that before appellant transferred De Luna's cases involving the tickets he received for the various offenses he committed, De Luna failed to appear in appellant's court on several of those cases.[61] The

---

[60] Although the State called the custodian of records, Faustina Tijerina, to testify, it did not ask her to explain the process of "constructive arrest" to the jury.

[61] The court of criminal appeals has stated that failure to appear before a judge is an offense and a warrant issued for that offense is expressly authorized under article 45.103 of the Texas Code of Criminal Procedure. *Black v. State*, 362 S.W.3d 626, 629, 637 (Tex. Crim. App. 2012) (citing TEX. CODE CRIM. PROC. ANN. art. 45.103 (West, Westlaw through 2013 3d C.S.) ("If a criminal offense that a justice of the peace has jurisdiction to try is committed within the view of the justice, the justice may issue a warrant for the arrest of the offender.")). In this case, the State presented no evidence that appellant's court lacked jurisdiction to issue the warrants for De Luna's multiple failures to appear in her court or that these multiple failures to appear were not separate offenses from the cases she transferred to the juvenile court. *See id.* Moreover, the jury heard evidence that "failure to appear" is considered contempt of court. Thus, assuming

62

docket sheets in De Luna's cases also show that before appellant transferred several of the cases, De Luna pleaded guilty to some of the charges, and appellant signed a judgment ordering De Luna to pay those fines. In those cases, the docket sheet shows that the court received the disposition letter from the juvenile center that De Luna's family did not respond for services. The disposition letter states that the offenses De Luna committed were contempt of court offenses. However, the disposition letter does not mention any of the class C misdemeanor offenses that De Luna pleaded guilty to committing in appellant's court.

The record also shows that appellant summoned De Luna to appear in her court after he turned seventeen possibly for his failure to appear or in order to pay the fines appellant ordered him to pay. The State presented no evidence that a justice court that has transferred cases involving violations, such as, for example, truancy, to the juvenile court loses jurisdiction over the failure to appear charges committed in the justice court prior to the transfer and that the justice court is not authorized to send the so-called "birthday letter" to that person for the separate offense of failure to appear in the justice court prior to the transfer.[62] From our review of the record, it appears that appellant

_____

arguendo that this is a jury issue, a rational juror could not have found beyond a reasonable doubt that appellant lacked jurisdiction to cite De Luna for his multiple instances of contempt of court. We note that the *Black* court stated that there is no rule requiring that the face of the arrest warrant identify the source for the issuing magistrate's finding of probable cause to arrest the defendant. *Id.* at 637.

In addition, the trial court admitted article 45.060 into evidence which allows a court that has "used all available procedures under this chapter to secure the individual's appearance to answer allegations made before the individual's 17th birthday, the court may issue a notice of continuing obligation to appear." *See* TEX. CODE CRIM. PROC. art. 45.060. The notice of continuing obligation requires that the court warn the individual that failure to appear pursuant to the notice of continuing obligation may be an additional offense and result in a warrant being issued for the individual's arrest. *See id.* In this case, evidence was presented that De Luna failed to appear in appellant's court on multiple occasions before she transferred the cases, that appellant sent out the so-called "birthday letters" after De Luna turned seventeen, and that De Luna again failed to appear in her court.

[62] We make no legal determination regarding whether appellant's court had jurisdiction under these circumstances. Instead, we are merely reviewing the evidence to determine whether the State met its

63

transferred the cases to the juvenile court to determine whether De Luna's multiple failure to appear violations in her court constituted contempt-of-court. This explains why the disposition letter from the juvenile court states that De Luna was put on probation for contempt of court offenses and that appellant's court was the complainant in those cases. The disposition letter does not concern De Luna's class C misdemeanor offenses because appellant's court was not the complainant in the class C misdemeanor cases against De Luna, and those complaints were filed by school district personnel for offenses committed at school—not for contempt of court.

The State presented no evidence regarding the procedure that a justice and juvenile court must follow when the justice court transfers a case to the juvenile court for a determination of whether the defendant committed contempt of court. The State had this burden because its theory was that appellant's transfer orders resulted in her court losing jurisdiction over De Luna's cases. The evidence presented to the jury does not include the juvenile court records. The State did not explain what happened to the class C misdemeanor offenses that De Luna pleaded guilty to committing in appellant's court. The evidence undisputedly shows that De Luna pleaded guilty to those offenses, and appellant ordered him to pay the fines for those offenses prior to appellant's transfers to the juvenile court.[63] Without any of this information, even assuming arguendo it is a jury

_____

burden of proving beyond a reasonable doubt that appellant's acts were unlawful under its theories. Whether her court lacked jurisdiction over De Luna's failure to appear violations is a question of law that is not for the finder of fact to determine. We do not intend to imply that the State could have proven that appellant's court lacked jurisdiction as a matter of fact in this case.

[63] This is where we believe the confusion occurred. Appellant signed the transfer orders listing the class C misdemeanor offenses. However, the documentary evidence shows that the juvenile court disposed of contempt-of-court charges against De Luna. We cannot explain such a discrepancy, and the State made no attempt to do so. Moreover, this does not support a finding that appellant's court lacked jurisdiction.

issue, the jury was in no position to determine whether appellant's court lacked jurisdiction.[64]

Moreover, appellant's court sent De Luna several notices of continuing obligation regarding the underlying class C misdemeanor offenses ordering that De Luna appear in appellant's court because those causes of action were still pending. It is undisputed that De Luna failed to appear when summoned pursuant to the notices of continuing obligation, also called the "birthday letters" by the State. Article 45.060, which was admitted into evidence and reviewed by the jury, states that a court that "has used all available procedures under this chapter to secure the individual's appearance to answer allegations made before the individual's 17th birthday" may issue a notice of continuing obligation to appear in that court. TEX. CODE CRIM. PROC. ANN. art. 45.060(b). "Failure to appear as ordered by the notice under Subsection (b) is a Class C misdemeanor independent of section 38.10, Penal Code, and Section 543.003, Transportation Code." *Id.* art. 45.060(c). However, article 45.060 does not state that there are any exceptions allowing a person to disregard the notice of continuing obligation and not appear to answer for those charges. Thus, De Luna was required to appear when summoned and inform appellant of the fact that he had already been punished by the juvenile court for those offenses, if that had in fact happened. De Luna did not testify that he disregarded the notice of continuing obligation because appellant's court lacked jurisdiction or because he believed that appellant was violating double jeopardy principles. Instead, the evidence presented show that failure to appear after receiving the notice of continuing

---

[64] As set out earlier, it is our interpretation of the law that a jury is not entitled to make the legal determination of whether a court has jurisdiction. However, we are merely explaining that the State failed to fully explain to the jury its own theory that appellant's court lacked jurisdiction.

65

obligation is a separate class C misdemeanor offense from the underlying charges. The undisputed evidence shows that De Luna failed to appear in appellant's court after he turned seventeen and therefore, committed separate class C misdemeanor offenses of failure to appear after being summoned, which is punishable by arrest. Appellant then issued the warrants for De Luna's arrest.

We conclude that based on the complexity of the issue before the jury, the evidence does not support an inference that appellant knew that her act of issuing the warrants for De Luna's arrest was in any way improper. This is so because the only evidence presented shows that appellant's interpretation of the law was different from the State's interpretation and from witnesses' interpretation. Our conclusion is further supported by the evidence that De Luna failed to appear in appellant's court after receiving the letters of continuing obligation, which is a class C misdemeanor. Thus, the evidence does not support a finding that appellant knew that her court lacked jurisdiction, even if it did.[65]

Furthermore, although the State insisted that appellant's court did not have jurisdiction and that the disposition letter did not grant her court jurisdiction, Cherry testified that she understood the letter as giving appellant's court jurisdiction. However, even if the letter did not mean what Cherry claimed, the State was still required to prove beyond a reasonable doubt that appellant knew that her court lacked jurisdiction or that De Luna had already been punished for the offenses. As explained above, it did not do so. As set out in detail above, the evidence clearly shows that the State's witnesses were

---

[65] Again, even if her court did lack jurisdiction, the remedy for a court acting without jurisdiction, which is not uncommon, is reversal on appeal, not criminal punishment.

confused by the transfer orders and the disposition letter.[66]  The State's theory was that appellant knew she lacked jurisdiction because the law is so clear.  We disagree.

Finally, we conclude that the evidence does not support a finding that appellant was not justified when she signed the warrants for De Luna's arrest because the undisputed evidence shows that he failed to appear in appellant's court after her court sent him the letters of continuing obligation; thus, he committed a separate class C misdemeanor offense for which appellant could have reasonably believed allowed her to sign the warrants.  Moreover, the State cites no authority, and we find none, making it unlawful as defined by the penal code for a trial judge to perform her statutory duties even if it is later determined as a matter of law that the court lacked jurisdiction to act.  In addition, the State cites no authority, and we find none, making jurisdiction of appellant's court an element of the offense of official oppression.  Thus, although we usually give the jury deference to believe or disbelieve the witnesses, in this case, whether appellant's court lacked jurisdiction to sign the warrants was a question of law and not one of fact for a jury to decide.  We conclude that appellant acted with a reasonable belief that her court had been granted jurisdiction to do the complained-of acts; therefore, she did not know that the act of signing the arrest warrants was unlawful, if it was.  *See id.* § 39.03(a)(1).  Accordingly, we conclude that the evidence was insufficient to support the jury's verdict that appellant committed the offense of official oppression under these facts.  We sustain appellant's first, second, and third issues.

---

[66] We are not able to determine from the limited information admitted at appellant's trial the effect that the transfer orders and disposition letter had on De Luna's cases.

### III.   CONCLUSION

Having concluded that the evidence is insufficient to support the jury's finding that appellant committed two counts of official oppression, we must acquit appellant.   *See Aldrich v. State*, 296 S.W.2d 225, 230 (Tex. App.—Fort Worth 2009, pet. ref'd); *Jacobs v. State*, 230 S.W.3d 225, 232 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (citing *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996) (en banc)).   We therefore reverse the judgment, dismiss the indictments, and render a judgment of acquittal in both counts.[67]

**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
31st day of July, 2014.

---

[67] Having rendered a judgment of acquittal, we do not reach appellant's remaining issues.